[Argued May 29; decided June 28, 1894.]

### STATE v. TARTER.
[S. C. 37 Pac. Rep. 53.]

1. CRIMINAL LAW — EVIDENCE OF THREATS.*— Evidence of threats made against defendant by his opponent, whether directly or by innuendo, and whether communicated to defendant or not, are admissible, when there is a conflict in the evidence as to who began the encounter, for the purpose of showing the circumstances of the affair, and to assist the jury in determining who probably began the affray.

2. CRIMINAL LAW — SELF-DEFENSE — ENTIRE CHARGE TO JURY.— A portion of an instruction to the effect that one indicted for murder in the first degree cannot successfully set up self-defense unless the necessity for taking life is actual, present, urgent, or, in a word, is the only reasonable resort of the

* Evidence of threats by the accused or by the person injured or killed is the subject of an exhaustive note to the case of *Wilson* v. *State* (Florida), 17 L. R. A. 654.—REPORTER.

party to save his own life or his person from great bodily harm,—is not erroneous, where the charge as a whole correctly states the law.

3. CRIMINAL LAW—JURY TRIAL—TESTIMONY OF DEFENDANT.—A jury is properly instructed that in weighing the testimony of a defendant the same rules govern as in the case of other witnesses, except that the interest the accused has in the termination of the case may be considered.

4. JUSTIFIABLE HOMICIDE—COMMISSION OF FELONY ON PROPERTY—CODE, § 1730.—Felonies, in resisting which one may justifiably take human life, within the contemplation of section 1730, Hill's Code, are such as robbery, larceny, or the like,—a contention over the ownership of property is not within the statute.

APPEAL from Union: MORTON D. CLIFFORD, Judge.

The defendant, Daniel Tarter, was indicted for the crime of murder in the first degree, and, upon being tried before a jury, was found guilty of the crime of manslaughter, and sentenced to the penitentiary for the period of twelve years. From this judgment the defendant has appealed, assigning numerous errors committed by the court below in admitting testimony, in giving certain instructions to the jury, and in refusing to give certain other instructions asked by him. The assignments of error from sixteen to twenty-three, inclusive, relate to the refusal of the court to allow proof of threats made by the deceased against the defendant, but which threats were not communicated to him. The record discloses that a witness for the defendant, by the name of Lee, testified on direct examination that the deceased, "something like a month before the shooting, and after he had purchased the pistol found in his room, talked to him about his purpose in getting such pistol." The witness was then asked: "Did you ever hear Bob Tarter make any threats against Dan Tarter?" to which he answered: "Not directly; no, sir." Then followed several questions aiming to show that the deceased proposed to the witness to go with him, raise a posse, and hang the defendant and some others, which questions were ob-

jected to, when the court, addressing counsel, said: "If he ever heard the deceased make any threats against the defendant, directly or indirectly, that he would kill him, let him answer." The counsel then said to the witness: "State if you ever heard him make any threats indirectly," and, upon objection being made, the court said to the witness: "Anything you ever heard him say, did you ever tell Daniel Tarter about it?" The witness answered: "No, sir." By the court: "And you never heard him make any direct threats?" To which the witness answered: "No, sir; I cannot say it was a direct threat." Thereupon the court sustained the objection. He was then asked: "State whether or not you ever heard Robert Tarter say anything in the nature of a threat against the life of Daniel Tarter." And again: "State whether or not you ever heard Robert Tarter make any statements showing that he had ill will or malice toward Daniel Tarter." Upon objection, both questions were excluded. Counsel for the defendant then asked the court for permission to ask the witness a leading question, which it refused to grant. The record shows that after the witness testified that he had talked to Robert Tarter, the deceased, a good many times shortly before the shooting, and just after the difficulty of the Tarters with Holstine, he was asked: "Did you have a conversation with him in which he stated what he had got that pistol for, with reference to Dan Tarter?" And again: "Did you ever have a conversation with him (the deceased) in which he told you what he was carrying that pistol for?" To both which questions objection was made and sustained by the court.

REVERSED.


*Messrs. Thos. H. Crawford,* and *T. Calvin Hyde,* for Appellant.

*Messrs. Geo. E. Chamberlain,* attorney-general, *Chas. F. Hyde,* district attorney, and *J. L. Rand,* for the State.

Opinion by MR. CHIEF JUSTICE LORD.

1.   There seems to have been an impression with the trial court, as to the admissibility of evidence of threats, that there is a difference between threats directly and those indirectly made against life.   Threats are regarded as indicative of intention, and evidence of them is not to be rejected in proper cases because they are couched in innuendo, vague boast, or obscure language.   But we think it is clear that the trial court excluded what was said in these conversations, wherein it was proposed to show that the deceased had indirectly threatened the life of the defendant, on the ground that if any such threats were made, they were not communicated to the defendant prior to the shooting; and this is the ground upon which the state's attorney mainly rested his argument.   But threats are admissible, though they have not been communicated to the defendant, when the evidence leaves the question in doubt as to whether the defendant or the deceased was the aggressor at the time of the encounter.   It is true there is some conflict of judicial opinion upon this subject, but the rule as now established by the later authorities is thus stated by Mr. Wharton: "When the question is as to what was deceased's attitude at the time of a fatal encounter, recent threats may become relevant to show that this attitude was one hostile to the defendant": Wharton on Criminal Law, § 1027.   Where the circumstances raise a question of self-defense, evidence of uncommunicated threats recently made are admissible for the purpose of showing the motive of the deceased, and the nature and character of the assault.   So, also, proof of threats not communicated is often admitted for the purpose of corroborating evidence

26 OR.—6.

of those communicated; and, likewise, where it is doubtful from the evidence which party commenced the affray, communicated threats are admissible to show who was probably the first assailant: Kerr on Homicide, § 396; *Wiggins* v. *People*, 93 U. S. 467. The testimony of defendant, and also of his sister and William Barnard, who were eye-witnesses to the shooting, was to the effect that the deceased was the aggressor, and that he was armed with a pistol; that he swore he would kill the defendant, and at the same time was reaching for his pistol; and that he was in the act of drawing it, to carry such threat into execution, when the defendant drew his pistol and fired. On the other hand, the testimony for the state tends to show that the deceased was unarmed and not the assailant, when the affray began; that he made no hostile demonstration toward the defendant, and committed no overt act, but that the shooting was deliberate and premeditated. In view of this conflict in the testimony, we think the court erred in excluding the evidence of these conversations, the purpose of which was to show that the deceased, shortly before the shooting, indirectly or by innuendo, threatened the life of the defendant. The evidence so excluded would have tended to shed light upon the transaction, by showing the motive of the deceased, and the nature and character of the assault which it is claimed he made upon the defendant, and in resisting which he was killed. It would have tended also to corroborate the defendant and his witnesses, who testified that the deceased commenced the affray and was the aggressor.

2. The next assignment of error relates to the instruction given by the court upon the doctrine of self-defense, and the portion of the charge objected to is as follows: "I charge you that the law regards human life as the most sacred of all interests committed to its care and protection, and there can be no successful setting up of self-de-

fense unless the necessity for taking life is actual, present, urgent, and unless, in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life or his person from great bodily harm." But this is not all the charge on that subject. The court further instructed the jury that "The law gives to every man the right of self-defense. This means that a man may defend his life, and may defend his person from great bodily harm. He may repel force by force, and he may resort to such force as, under the circumstances surrounding him, may reasonably seem necessary to repel the attack upon him, and in his defense he may even go the extent of taking the life of his adversary. The right of self-defense, in cases of this kind, is founded upon the law of nature, and is not, nor can be, superseded by the law of society; hence, if the jury find, from the evidence in this case, that the defendant, at the time he fired the shot and wounded the deceased, had reasonable ground to believe that his life was in imminent danger, or that he was in danger of great bodily harm, at the hands of the deceased, and, so honestly believing, fired the fatal shot, he was justified under the law in so doing, and you should find the defendant not guilty. If the jury believe from the evidence that the defendant had no reason to believe that the deceased intended to take his life, or to inflict upon him great bodily harm, and the defendant shot the deceased in revenge, or in a reckless spirit, then and in that event the defendant is not entitled to claim exemption from punishment on the ground that the killing was in self-defense." This must be read in connection with the portion objected to, and when taken as a whole is proper, and comes fairly within the doctrine approved by this court in *State* v. *Morey*, 25 Or. 241, 35 Pac 655. And so considered, it obviates the objection raised against it and therefore cannot be considered error upon this record.

3. Another assignment of error questions the propriety of the following instruction: "Under the statutes of this state, since eighteen hundred and eighty, the defendant has the right to come upon the witness stand and testify in his own behalf; and when he does so testify, you are to weigh his testimony under the same rules as you do that of other witnesses, excepting the further fact that you have the right to take into consideration the interest he has in the termination of the case." The interest of a witness in the result of litigation, whether in civil or criminal cases, is a proper matter to be considered by the jury, and it is not error for the court to so instruct.

4. The other assignments of error which we shall consider are, the refusal of the court to give the following instructions: "I further instruct you that if you find from the evidence that 'June,' the filly which deceased and defendant were contending over, was bequeathed to May Lloyd by her mother, and that the defendant was acting at the request of his mother in delivering the filly to May Lloyd, then the defendant had the right to the possession of said property as against deceased, and had the right to maintain that possession as against deceased. The killing of a human being is justifiable to prevent the commission of a felony upon the property of such person, or upon property in his possession, and if the jury find from the evidence in this case that the defendant was in the possession of a mare or filly entrusted to him by his mother to deliver to his sister May Lloyd, and the deceased at the time was attempting to take said property from him by force, with intent to convert the same to his own use feloniously, then the defendant had the right to defend his possession of said property, and to use all the force necessary to retain the possession thereof, even to the taking of the life of deceased. Every man has the right to care for and look after his own property, and the property of

those entrusted to his care, and to that end to go upon the
public highways and commons with such property, and
carry, lead and drive the same from one locality to an-
other, and if, while so engaged, an attempt is made to
take such property from him by force, he may oppose
such attempt by such force as seems reasonable under the
circumstances, and necessary to retain the possession of
the property, and if, while so doing, his assailant makes a
felonious assault upon him, from which he reasonably
apprehends death or great bodily harm to himself, unless
he kills his assailant, and he, so honestly believing, kills
his adversary, such killing is justifiable." The evidence
does not tend to show that deceased intended to commit a
felony against the property of defendant, but rather that
he was contending for the possession of the filly as the
property of his wife. The felony contemplated by the
statute, which justifies the killing of a human being, is
robbery, larceny, or the like: Hill's Code, § 1730. The
refusal, therefore, to so charge the jury was not error.
The fact is, that much of these instructions, as others
asked and refused, are based on evidence not disclosed by
the bill of exceptions. There is in the record what pur-
ports to be the testimony in the case but it is not made a
part of the record, hence cannot be considered by us in
passing upon such instructions. There is no doubt that
some of the instructions asked are good law, but in view
of the state of the record we cannot consider them. For
the reasons, however, already stated, we must reverse the
judgment and order a new trial.

                                        REVERSED