Argued 27 June; decided 13 August, 1900.

## STAMPER *v.* RAYMOND.

[62 Pac. 20.]

MALICIOUS PROSECUTION — ESSENTIAL ELEMENTS.

1. To support an action for malicious prosecution the plaintiff must prove that the prosecution was actuated by actual malice, that it was without probable cause, and that it has terminated.

MALICIOUS PROSECUTION — PROBABLE CAUSE.

2. In determining whether the prosecution was instituted with probable cause it is the duty of the court to declare to the jury that the existence of certain facts shows a want of reasonable cause, though whether those facts exist must be determined by the jury from the evidence: *Gee* v. *Culver*, 12 Or. 228, and *Hess* v. *Oregon Baking Co.* 31 Or. 503, cited.

EXISTENCE OF MALICE IS A JURY QUESTION.

3. In actions for malicious prosecution the jury must determine whether the defendant acted with malice, and any wrong and unlawful act done knowingly and purposely to the injury of the plaintiff is malicious: *Gee* v. *Culver*, 13 Or. 598, cited.

COMPETENT EVIDENCE ON QUESTION OF MALICE.

4. In an action for malicious prosecution for assault, where the alleged assault was committed by plaintiff in resisting defendant's attempt to remove grain from plaintiff's possession, and each party claimed that, under the terms of a contract between them, he was entitled to the possession of the grain, the contract was properly admitted in evidence, as

showing the agreement as to their several rights to the grain in controversy, and therefore affecting the question whether defendant's prosecution was malicious, or merely in vindication of his rights.

MALICIOUS PROSECUTION — EVIDENCE OF MALICE.

5. Plaintiff in an action for malicious prosecution had purchased premises from defendant, agreeing to pay therefor by delivering to defendant all the wheat raised thereon yearly, less the amount necessary to plaintiff for seeding, food for stock, and family expenses; defendant to have the right to take such wheat if plaintiff failed to deliver. Defendant, claiming the right so to do, attempted to remove plaintiff's grain, but was prevented by plaintiff. Next day defendant had plaintiff arrested for assault, and, while he was in custody, removed the grain. *Held,* that it was proper to ask plaintiff if any grain was left for his own use, as tending to show whether the purpose of defendant in removing the wheat was only to take his own share, or to oppress plaintiff by taking more, thus indicating malice.

REMOTE EVIDENCE OF MALICE.

6. In an action for malicious prosecution for assault, where the alleged assault was committed by plaintiff in resisting defendant's attempt to remove grain from plaintiff's possession, evidence that the parties had had difficulty over the crop of the previous year, such difficulty having been all settled shortly after it arose, is not proper, the transaction being too remote.

WITNESSES — KNOWLEDGE OF SUBJECT.

7. Where a witness shows himself unacquainted with plaintiff's standing before and after the acts complained of, he is not competent to testify as to the damage to plaintiff's reputation and credit by defendant's acts.

MALICIOUS PROSECUTION — EVIDENCE OF WANT OF PROBABLE CAUSE.

8. The discharge of an accused person on his preliminary examination by a committing magistrate is *prima facie* evidence of want of probable cause for causing the arrest.

From Umatilla: STEPHEN A. LOWELL, Judge.

This is an action by Jesse L. Stamper against W. W. Raymond and J. B. Huntington for malicious prosecution. Essentially, it is alleged by the complaint that on August 22, 1899, the defendants maliciously conspired together to cause the arrest and imprisonment of the plaintiff, with the intent to injure him, and in pursuance thereof falsely, maliciously,

38 OR.—2.

and without probable cause, instituted criminal proceedings against him before M. A. Ferguson, a justice of the peace for Adams District, in the County of Umatilla, Oregon, whereby they charged him with having on August 21, 1899, committed the crime of assault with a dangerous weapon, to wit, a shotgun, upon the defendant Warren W. Raymond, and thereupon caused a warrant to be issued, and the plaintiff to be placed under arrest and imprisoned for the space of ten hours; that thereafter, on August 28, and after a hearing and trial, plaintiff was acquitted of said charge and discharged from custody; that the costs of the proceedings were taxed to Raymond, and the prosecution thereby determined. The allegations of conspiracy, malice, and want of probable cause are denied by the answer; and for a further defense it is alleged that plaintiff did on the said twenty-first day of August, 1899, assault the defendant Raymond with a dangerous weapon, namely, a double-barreled shotgun, loaded with powder and shot, and should be arrested, tried, convicted, and sentenced therefor. The reply takes issue upon the allegations of assault, and, for a defense to the new matter, alleges that at the time designated the plaintiff was the owner and in possession of 1,344 sacks of wheat and 269 sacks of barley, then on his premises, and that the defendants wrongfully and unlawfully attempted in the night-time to remove said grain against his consent; that, for the purpose of preventing such removal and protecting his property, he took and had in his possession a shotgun, which he held on his left arm, with the muzzle pointed away from the defendants, and, without attempting to use it, he directed them to desist from further interference therewith; and that these are the same acts alluded to in the defendants' answer. A trial was had before a jury under the issue thus tendered, and, the judgment being favorable to the plaintiff, the defendants appeal.                                   REVERSED.

For appellants there was an oral argument by *Mr. John J. Balleray,* with a brief over the names of *J. J. Balleray* and *T. G. Hailey* to this effect:

In an action of malicious prosecution for having charged plaintiff with an assault with a dangerous weapon on defendant, a written contract between plaintiff and defendant for the purchase and sale of a ranch, to be paid in wheat, and specifying the amounts of wheat raised on the ranch each year, the amounts turned over by plaintiff to defendant each year, what is necessary for horse feed, seeding, and expenses of the family in running such ranch, are collateral matters and not admissible in evidence, and are irrelevant and incompetent: *Grout* v. *Cottrell,* 143 N. Y. 677 (38 N. E. 717); *Lunsford* v. *Deitrich,* 93 Ala. 565 (30 Am. St. Rep. 79, 9 South. 308); *Thompson* v. *Beacon Val Rubber Co.* 56 Conn. 493 (16 Atl. 554); *Thurston* v. *Right,* 77 Mich. 96 (43 N. W. 860); *Wright* v. *Church,* 110 N. Y. 463 (18 N. E. 258); *Tillotson* v. *Warner,* 3 Gray, 574.

It is always error to give instructions which must mislead and confuse the jury. No authorities are needed on that proposition. One side of the case the court gave the instructions asked by the defendants. Then he went to work and gave instructions diametrically opposite to those given at the instance of the defendants, and in effect told the jury that all that he had already said was wrong and that the law was just the other way. Of course, those instructions were excepted to. The instructions remind us forcibly of some lines in Hudibras:

> "What makes all doctrines plain and clear?
>     About two hundred pounds a year.
> What makes that which was true before
>     All false again?  Two hundred more."

For respondent there was an oral argument by *Mr. Chas. H. Carter,* with a brief over the names of *Jas. A. Fee* and *Carter & Raley* to this effect:

When a magistrate has authority to bind over or discharge and he discharges, the discharge is equivalent to acquittal and will avail the accused as evidence to support the allegation of acquittal; it is not necessary that such termination should be such as would bar any other prosecution for the same offense: 14 Am. & Eng. Enc. Law (1 ed.), pp. 28-31; *Sayles* v. *Briggs,* 4 Met. 421; *Cardival* v. *Smith,* 109 Mass. 158 (12 Am. Rep. 682); *Moyle* v. *Drake,* 141 Mass. 238; *Driggs* v. *Barton,* 44 Vt. 124; *Casabeer* v. *Rice,* 13 Neb. 465.

The discharge of defendant by the examining magistrate is evidence of want of probable cause: *Hidy* v. *Murray,* 101 *Iowa,* 65 (69 N. W. 1138); 14 Am. & Eng. Enc. Law (1 ed.), pp. 19-20; *Rider* v. *Kite,* 61 N. J. Law,.8 (38 Atl. 754); *Brown* v. *Vittur,* 47 La. Ann. 607 (17 South. 193).

Malice can be inferred when the object of the prosecution is simply to get property or to collect a debt: *Morgan* v. *Duffy,* 94 Tenn. 686 (30 S. W. 735); *Ross* v. *Langworthy,* 13 Neb. 492 (14 N. W. 515); *Sebastian* v. *Cheney* (Tex. Civ. App.), 24 S. W. 970, 25 S. W. 691.

The criminal law was not designed to collect debts, and the instituting of a criminal prosecution against a debtor to recover property is, in a legal sense, malicious: *Kelly* v. *Sage,* 12 Kan. 109; *Gabel* v. *Weisensee,* 49 Tex. 131; *Gee* v. *Culver,* 13 Or. 598; 14 Am. & Eng. Enc. Law (1 ed.), p. 20.

The appellants are most unjust to the trial judge in their insinuations against him; the suggestions and innuendos in their brief are not supported by a single circumstance that occurred during the trial. Counsel is given to the vigorous, rough-and-tumble, vituperative style of trying causes before

a jury (and he tries them remarkably well, too), and he cannot lay aside his habits in this regard, even when he comes into this court.  To quote his favorite author, he is one of those men mentioned by Hudibras' lines

> "Such as do fix their faith upon
> The holy text of pike and gun;
> And prove their doctrine orthodox
> By apostolic blows and knocks."

Upon the whole case we contend that there was no error committed by the circuit court which either appellant can complain of.  If any error at all was committed, it was such as benefited them and injured us.

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

1.  To support the action it is necessary to show that the prosecution complained of was instituted with malice and without probable cause.  These are two essential and distinct ingredients, without the concurrence of which it cannot be maintained.  The prosecution may have been without probable cause, but, if set in operation without malice, there can be no recovery in this action.  So it is that, with whatsoever malice the prosecution may have been conceived, if the prosecutor had probable cause for proceeding with it he does not thereby lay himself liable to damages.  To these ingredients may be added a third, namely, that the prosecution shall have terminated.  The burden of proof is with the plaintiff to establish all these essential elements if he would succeed.

2.  Malice is ordinarily, perhaps exclusively, a question of fact for the jury, to be ascertained from the attendant facts and circumstances of the case, and, while it may be inferred from the facts which go to establish the want of probable cause, it does not follow as a necessary sequence.  Hence it is not a conclusion that the court will declare, and the

cases are rare, if indeed they exist at all, where it becomes incumbent upon the court to direct the jury to find malice from such facts alone.

3. The want of probable cause is a question of law for the court. Where the facts are admitted, it is the duty of the court to declare to the jury whether or not there is want of probable cause; otherwise, it should be left to the jury to determine whether certain controverted facts exist, they being instructed that upon their finding touching these facts will depend the question of want of probable cause. That is to say, as observed by Mr. Chief Justice WALDO in *Gee* v. *Culver,* 12 Or. 228 (6 Pac. 775), "the judge must say to the jury, 'I tell you, if you think so and so, there is a want of reasonable and probable cause.'" For a full discussion of the subject, see, also, *Hess* v. *Oregon Baking Co.* 31 Or. 503 (49 Pac. 803). Whether the circumstances relied on are true is a question for the jury, but whether, if true, they amount to want of probable cause, is a question of law for the court.

There is no such thing as implied malice, or, rather, the doctrine of implied malice has no application in a case for malicious prosecution. There must be malice in fact, or actual malice, which relates to the state or condition of the mind of the person who caused the arrest or instituted the prosecution, which is, as we have seen, a question of fact for the jury to determine in the light of the peculiar circumstances surrounding and attending each particular case. It may proceed from a mind evilly disposed towards the person prosecuted, and may be manifested by acts indicating spite, hatred, and ill will, denoting a purpose to bring opprobrium or discredit upon him, to his detriment and injury; but there need be no personal ill will, desire for revenge, or other base and malignant purpose, and it may be inferred from any improper or unjustifiable motives which the facts disclose influenced the conduct of the party instituting the prosecution;

and this comprehends any act done willfully, or knowingly and purposely, to the prejudice and injury of another, which is at the same time unlawful,—that is, has not the sanction of law: *Gee* v. *Culver,* 13 Or. 598 (11 Pac. 302). "Whatever," says McCLELLAN, J., in *Lunsford* v. *Dietrich,* 93 Ala. 565 (9 South. 308), "is done willfully and purposely, whether the motive be to injure the accused, to gain some advantage to the prosecutor, or through mere wantonness or carelessness, if it be at the same time wrong and unlawful within the knowledge of the actor, is, in legal contemplation, maliciously done."

Probable cause, as approved by the United States Supreme Court, "is the existence of such facts and circumstances as would excite the belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted": *Wheeler* v. *Nesbitt,* 65 U. S. (24 How.), 544, 16 L. Ed. 765. Mr. Sutherland defines it as "such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the facts essential to the prosecution exist": 3 Suth. Dam. (2 ed.) § 1239. Mr. Hilliard, after the discussion of many authorities bearing upon the rule, says: "Probable cause for instituting a prosecution is held to be such a state of facts known to and influencing the prosecutor as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice upon the facts within the party's knowledge, to believe or entertain an honest and strong suspicion that the person accused is guilty": 1 Hil. Torts (3 ed.), c. 16, § 18. HAWKINS, J., in *Hicks* v. *Faulkner,* 8 Q. B. Div. 167, 171, defines it as "an honest belief in the guilt of the accused, based upon a full conviction, founded upon reasonable grounds, of the existence of a state of circumstances which, assuming them to be true, would reason-

ably lead any ordinarily prudent and cautious man, placed in the position of the accuser, to the conclusion that the person charged was probably guilty of the crime imputed." And STONE, C. J., in *Jordan* v. *Ala. Gt. So. R. R. Co.*, 81 Ala. 220 (8 South. 191), defines it as "such a state of facts and circumstances as would lead a man of ordinary caution and prudence, acting conscientiously, impartially, reasonably, and without prejudice, to believe  *  *  *  that the accused is guilty." But, whatsoever may be the various shades of expression used by authors and jurists in attempting to give a technical definition of the term "probable cause," it depends upon the prosecutor's honest belief or conviction of guilt, based upon such facts as will justify the belief in the mind of a prudent and reasonable man (14 Am. & Eng. Enc. Law [1 ed.], 24) ; and it is upon the existence of such belief, based upon such facts and circumstances, that the question of probable cause rests, and not upon the actual guilt of the accused : 1 Hil. Torts (3 ed.), c. 16, §§ 17a, 18a. With these preliminary observations relative to the law governing the case in general, we will proceed to a consideration of some of the errors specifically assigned.

4.   The plaintiff, testifying in his own behalf, stated at the trial, among other things, that he had lived upon the place then in his possession since 1896; that he purchased it from Raymond, one of the defendants, the fall before he moved on it; that he entered into a contract with him, first verbal, then written, therefor; and that he had raised a crop under it in the year 1899. The contract, being identified, was admitted in evidence, over objection, and the ruling of the court with respect thereto assigned as error. The contract is made the basis of, and is incorporated into, a bond for a deed given by Raymond and wife to the plaintiff, and provides, among other things, that Stamper, who is designated as the first party, shall, in consideration of the conveyance of the premises described, to be made when certain con-

ditions are performed, enter into possession of the premises and farm the same from year to year until such time as his agreements and covenants are fully kept and performed; that he shall keep the buildings in good repair and pay all taxes during the life of the contract, and shall deliver to Warren W. Raymond, the second party, at Waterman Station, the full amount of 20,000 bushels of wheat, to be produced upon the premises; that he shall deliver all the wheat produced each year until the full amount of 20,000 bushels has been delivered; provided, however, that he shall have the right to and may retain a sufficient amount of said wheat each year for seed for said premises, feed for his stock, and a reasonable amount for household and necessary family expenses; that he shall harvest said wheat at his own expense as nearly as possible in each year in a good, seasonable time, and deliver the same, as aforesaid, as soon as threshed; that any deficiency for necessary harvest expenses shall be paid out of grain raised on said premises; and that he will not sell, convey, assign, or mortgage said premises, or any crops produced thereon. It is further provided that, in case default is made in the delivery of wheat as stipulated, the second party is permitted and empowered, at his option, with or without notice, to take such wheat, or any part thereof, which should be delivered under the contract, at the time of default, wheresoever it may be, and deliver the same at the place designated, at the expense of Stamper, and, in case he should fail to pay such expense for the period of thirty days, that the second party may, at his option, declare the contract broken and forfeited, in which event the first party shall give peaceable possession when demanded. It is further provided that in case said premises, or any crops of wheat produced thereon during the life of the contract, shall be attached or levied upon by the creditors of the first party, the second party may, at his option, declare the contract forfeited and take possession of the premises and all crops of wheat

thereon, and may hold the same absolutely, and without liability to the first party.

After the admission of the paper the witness further testified that he produced upon the premises in the year 1899 1,519 sacks of wheat and 204 sacks of barley; that he hauled 175 sacks of wheat to Waterman Station as soon as the threshing was completed; that thereafter he was engaged in heading, intending to use the receipts arising from that source to defray in part the expenses of harvesting; that the crop had not been threshed a week when Raymond started to haul what remained to the station; that he had been warned that Raymond and some teamsters were going to take it, and that he went out to protect it between 9 and 10 o'clock at night, and took his gun with him; that as he went he met a man with a team and wagon loaded with wheat, whom he directed to halt, but without effect; that a little later he saw Raymond going through the field on foot; that he rode up to him, and thence along with him to where Huntington, Duff, and Haven were; that Raymond asserted he was going to take the wheat, whereupon the witness said: "I defy either of you to touch that wheat any more. It is my property." He further testified that he did not point his gun at any one, nor did he have it cocked, but that they commenced to unload the wheat, and that the other teams went out of the field; that next morning he was placed under arrest by the constable, attended by Huntington, the co-defendant of Raymond; that Raymond hauled the wheat and all the barley from the field to the station while he was under arrest; that he hauled and delivered 562 sacks of wheat to apply on the contract; and that Raymond's teams hauled the rest. Other testimony of like nature was offered and received, but this is sufficient for our present purpose. If the testimony adduced prior to offering the contract was insufficient to show the relevancy of said contract, and that subsequently produced by the plaintiff supplies the deficiency, it obviates

the objection.  Hence we will consider the whole in our treatment of the question presented.

It is apparent that there was a controversy between Stamper and Raymond as to who was entitled to possession of the wheat at the time Raymond attempted to remove it from the field. It had been produced upon the premises which constituted the subject of the contract, and the relative rights of the respective parties thereto were matters which they attempted to fix and define through stipulations and conditions inserted for the purpose; and hence such rights were made dependent upon the contract, and being so the contract was pertinent to the inquiry, and was properly admitted.   Such was the course pursued in the case of *Vinal* v. *Core,* 18 W. Va. 1, 45, where the controversy was over the right to the possession of certain oil which had been produced under a lease.   The terms of the lease, although it was not produced, were considered as relevant to the issue.   So, also, was an assignment of the landlord's interest in the product introduced and considered, although it was held not to have included the particular oil which formed the basis of the controversy.   The case involves, also, a construction of those features of the contract which pertain to the controversy and which led to the encounter.   This is a matter of law for the court, and when construed the jury should find under the evidence what conditions have been observed, and what not, and which of the parties is in fault, and determine their verdict accordingly.   The contract is for the sale of the premiss described therein, by which possession is given to the vendee, and which he may maintain as long as he complies with the conditions prescribed.   This gave him a potential ownership, and the crops produced thereon became and were his from the time of their germination to their severance from the soil and delivery to Raymond, or until such default on his part as entitled Raymond to take them.   There was no attempt by Raymond to reserve ownership therein until ful-

fillment of any condition, while, on the other hand, it was expressly stipulated that Stamper shall not sell, convey, assign, or mortgage any of said crops, from which the intendment is manifest that the ownership thereof was to rest with Stamper. There is a stipulation, however, that Stamper shall deliver to Raymond, at Waterman Station, all wheat produced each year as soon as threshed; reserving only to himself a sufficient amount for seed for said premises, feed for his stock, and a reasonable amount for household and necessary family expenses. It is further stipulated that Stamper shall harvest the wheat at his own expense as nearly as possible, and that any deficiency for necessary harvesting expenses shall be paid out of grain raised on the premises.

The phrase "as soon as threshed," indicating the time of delivery, is obvious and plain, and it should be made as soon thereafter as reasonable dispatch will warrant, considering the usual means and appliances at Stamper's command with which to accomplish the purpose. He could not postpone it until he had done some other act not contemplated by the contract, and the agreement to harvest as nearly as possible at his own expense does not afford authority for attending to other business first, with a view of earning means with which to defray such expense, and therefore cannot be considered as modifying or in any way qualifying the stipulation touching the time of delivery. Stamper was entitled to retain wheat and other grain sufficient for seed the following year, feed for his stock, and a reasonable amount for household and necessary family expenses, and to this should be added sufficient to cover any deficiency in necessary harvesting expenses. All the residue he should deliver to Raymond. Now, if Stamper did not make the delivery of the wheat under the contract which Raymond was entitled to at the time specified (and these are questions for the jury), then Raymond was authorized to go at once upon the premises, without notice, and take such wheat as he was entitled to,

and haul it to the station, at the expense of Stamper; but in doing so he was not warranted in committing a breach of the peace. If he met with resistance from Stamper, it was his duty to desist and obtain his grain through legal or peaceful methods. If Stamper was in the right, and not in default, he was entitled to use just such force as was necessary to prevent the taking of his wheat; but, unless assaulted so that it became necessary to defend his person from violence, he had no legal authority or right to assault Raymond with a dangerous weapon. The act of Raymond in attempting to take the grain was not in the commission of a felony. There was a dispute between the parties touching the right to possession, and, in the endeavor to obtain or hold it, each, as he contends, was attempting to pursue the course which he supposed was proper in the premises, and which the conditions of the contract authorized; and it lacks the ingredient of intent, which is essential to the commission of a felony. If Stamper was in the wrong in his contention touching the delivery, then he was the aggressor from the beginning, as he was interfering with Raymond's lawful right to take possession of the wheat. In support of these views, see *State* v. *Tarter,* 26 Or. 38 (37 Pac. 53); *People* v. *Payne,* 8 Cal. 341; *State* v. *Forsythe,* 89 Mo. 667 (1 S. W. 834). All these are matters for consideration in determining whether the defendants were prompted by malice in instituting the criminal proceeding before the committing magistrate, and whether they, acting conscientiously, impartially, reasonably, and without prejudice upon the facts within their knowledge, and as prudent and reasonable men, had cause, or, in other words, had probable cause, for so doing.

5.    The question, "Did they leave on your premises any wheat for your own use?" propounded to Stamper, and noted in assignment of error No. 2, was pertinent and relevant, as showing the purpose of Raymond in removing the wheat

from the field,—whether to take the share belonging to him, or to exceed it and thereby oppress Stamper.

6. Assignment No. 3 involves the competency and relevancy of the question put to Stamper on his examination in chief for the purpose of substantiating his cause, as follows: "Had Mr. Raymond been annoying you and harassing you about these premises and crops prior to the time of that arrest?" The object of the inquiry, no doubt, was to show malice on the part of Raymond in causing the arrest of Stamper for the alleged assault, which difficulty was brought on by a dispute over the right to the possession of the wheat crop of 1899. That was the immediate cause of the controversy, but the question was intended to cover a much wider range, and the witness so understood it, as his answers indicate. He went back to the inception of the contract, and related a circumstance of his buying some seed and feed of Raymond under a verbal contract touching the premises. This ran on without final settlement until the harvest season of 1898, when he was induced to give his note to Raymond for the amount—some $234. The note was very shortly assigned to Rogers, who attached Stamper's growing grain; and thereupon Raymond instituted a suit against Stamper to annul the contract of sale of the premises, in pursuance of which a receiver was appointed. The note was settled in a short time, the attachment discharged, and the suit for a receivership dismissed. There was an attempt between the parties just prior to the attachment and suit to agree upon a settlement, having in view an annulment of the contract, but the result was not accomplished. The question is one not without its difficulties, in determining whether or not the testimony should have been allowed to go to the jury. These negotiations and transactions may have had some tendency to show malice on the part of Raymond against Stamper, but they involved a further inquiry as to who was in the right during their pendency, as, if Raymond

was in the right, malice could not be imputed to him from the mere instituting of the civil proceedings alluded to. Thus was engendered, very naturally, a collateral inquiry into the motives of the respective parties touching their acts and demeanor towards each other, which culminated with the attachment and suit for a receivership. The transactions were entirely distinct, as respects time and circumstances, from the one which has culminated in the present action. In the endeavor to show malice in cases of this nature, large latitude is usually indulged; but it is necessary that the inquiry should have some perceptible relation to the controversy which led directly to the alleged malicious prosecution—some connected bearing—so that it can be said that the malice which induced the one, or was manifested thereby, has been harbored for a new opportunity to arise, whereby he may again give rein to such impulse, prompted by a perpetuation of the same motive, and that the present was the opportunity for which he had been seeking. It does not seem to us that such an inference is reasonably deducible from the premises. The transaction of 1898 appears to have been closed by the discharge of the attachment and a dismissal of the suit for a receivership, and had remained closed, for aught that appears, for nearly a whole year, and until another crop had been produced, to which the new conditions wholly related. Under such circumstances, we are of the opinion that the transactions of 1898 and prior thereto were too remote and disconnected to be relevant for the purpose of showing malice in the transactions concerning the crop of 1899, and should not have been allowed, for that reason, to go to the jury.

The fifth and sixth assignments go to the inquiry respecting the value of the wheat and barley produced. If confined to the crop of 1899, the questions were pertinent.

Assignments 8 to 15 and 17 to 19, inclusive, involve various inquiries touching the expenses of harvest in 1899, the amount of seed wheat that would be required for the follow-

ing season, the amount requisite for family use, whether expenses had been paid, and the like, and they were all proper and legitimate.

Assignment 16 relates to an inquiry made of the witness as to what the contract provides. The contract speaks for itself, and the question should not have been permitted, nor the answer thereto.

Assignments 20 to 22, inclusive, are touching the prior controversy of 1898, and the litigation growing out of it, which was not pertinent or relevant matter to go to the jury.

The questions put to Mrs. Etta Stamper, covered by assignments 24 to 26, were competent. They called for evidence touching the identical transaction involved in the controversy.

7. Assignments 38 and 39 are relative to the nonimpairment of Stamper's credit by reason of the arrest, and the inquiry was not proper, as the witness Kirk had not shown himself to have been acquainted with his credit in the community before and after the arrest.

Assignments 40 to 43, inclusive, involved inquiries respecting the expense of farming such a place as Raymond had contracted to convey to Stamper, of threshing grain produced thereon, and expenses of plaintiff's family. All these matters were inquired into on cross-examination of the defendants' witness, who had testified in relation thereto in his examination in chief, and were consequently legitimate subjcts of inquiry.

The forty-fourth to forty-sixth assignments, inclusive, are concerning an attempted impeachment of some witnesses. The inquiry was proper, the requisite foundations having been laid therefor.

The forty-seventh and forty-eighth assignments are of questions put to Stamper in rebuttal, while a witness in his own behalf, touching the length of time the crops of 1897 and 1898 remained in the field after the same were threshed

and before delivery. For the purpose of eliciting substantive testimony the inquiries were not proper, as the circumstances referred to were too remote. They were possibly permissible to rebut matter that defendants brought into the case themselves. There is some question upon the record as to whether one of the inquiries was not directed to the crop of 1899. If so, it was entirely pertinent and proper.

8. We come now to the instructions of the court. It is first insisted, and not without reason, that contradictory instructions were given touching the ownership of the wheat, and the right and authority of Raymond to take it from the field and haul it to Waterman Station. What we have said touching the construction of the contract will indicate what the ruling of the court should have been upon these questions. The wheat, when produced, was the property of Stamper until delivered by him at Waterman Station, or until he failed in making the delivery according to his stipulations in the contract. If he made default in the delivery, then Raymond was authorized to take the proper share thereof to which he was entitled, which would be all the grain produced, less the amount necessary to meet the expenses stipulated for, and which Stamper was authorized to retain for the purpose, and haul it to the station at the expense of Stamper. Under no other circumstances had he a right to take the wheat and haul it off, even at his own expense.

The sixteenth, seventeenth and eighteenth instructions requested by the defendants and refused, whether deducible from a proper construction of the contract or not, were substantially given in the general charge, and no error can, therefore, be predicated upon the court's ruling thereon.

The following instructions were given, viz.: "I instruct you that when a criminal proceeding is brought before a justice of the peace for examination in this state, on a charge of assault with a dangerous weapon, the question as to

38 OR.—3.

whether there is probable cause to believe the party charged guilty of that crime is the question tried by the justice of the peace,"—which was excepted to by defendants as not being the law of the case, and they asked the court to instruct "that the fact that the defendant was discharged at the preliminary examination is no evidence of malice or want of probable cause." This was refused, an exception saved, and error assigned, which brings up the question touching the effect of a discharge by a committing magistrate as evidence in an action for malicious prosecution. As was said in *Eastman* v. *Monastes,* 32 Or. 291 (67 Am. St. Rep. 531, 51 Pac. 1095), the authorities are divided upon the question; but it appears to us that the better reasoning goes to the support of the proposition as laid down in *Frost* v. *Holland,* 75 Me. 108, where it is said that "in an action for malicious prosecution the want of probable cause will not be inferred from the mere failure of the prosecution, nor from a mere acquittal upon trial, but the weight of authority seems to be in accordance with the ruling that proof that the plaintiff was discharged by the examining magistrate, for want of probable cause to believe him guilty, makes a *prima facie* case for the plaintiff in this respect, so that the defendant is called upon to offer proof to the contrary." Mr. Cooley says: "An acquittal and discharge by a magistrate having power to bind over is evidence of want of probable cause, as is the ignoring of a bill by a grand jury": Cooley, Torts, 184. Mr. Greenleaf says: "The discharge of the plaintiff by the examining magistrate is *prima facie* evidence of the want of probable cause, sufficient to throw upon the defendant the burden of proving the contrary": 2 Greenleaf, Ev. (15 ed.), § 455. And it is said in *Vinal* v. *Core,* 18 W. Va. 1: "But the magistrate or grand jury would violate his or their duty if he or they discharged the accused when the evidence produced the belief that he was probably guilty of the crime. He or they act directly on the question whether there is

probable cause for the prosecution, and, if he or they discharge him, it must be because in his or their judgment there is no probable cause for the prosecution, and accordingly the weight of authority and of reason is that such discharge by a justice or by a grand jury is *prima facie* evidence that there is a want of probable cause for the prosecution."

It is quite generally held that, where proof is offered upon the examination which is deemed sufficient by the committing magistrate upon which to commit, his commitment accordingly will afford *prima facie* evidence of probable cause: *Ricord* v. *Cent. Pac. R. R. Co.,* 15 Nev. 167; *Ganea* v. *Southern Pac. R. R. Co.,* 51 Cal. 140. The two phases of the question seem to have been brought together in Missouri, where it is observed that "the action of a grand jury in finding a bill of indictment, or the commitment of the prisoner, by the examining magistrate is *prima facie* evidence of probable cause. * * * On the other hand, the refusal of the committing magistrate to bind the defendant over has been said by this court to be very persuasive evidence that the prosecution was without probable cause": *Sharpe* v. *Johnston,* 76 Mo. 660, 670. If such evidence is "very persuasive," then is the distinction between that and its *prima facie* effect very slight—so slight, even to the veritable state of being without a difference. But, if a commitment or indictment after hearing and examination is *prima facie* evidence of probable cause, then why should not a discharge under like conditions have the effect, *prima facie,* to show want of probable cause? The magistrate passes upon the same question in each event, and his determination should have like force, whether for a commitment or discharge. So we conclude that when there has been an examination before a magistrate, upon proof produced for the purpose of showing the defendant's guilt, and after a hearing the magistrate has discharged the defendant because there was not sufficient cause shown for believing him guilty under the statute (Hill's

Ann. Laws, § 1606), then that the discharge is *prima facie* evidence of want of probable cause. But this is subject to dispute, and may be overcome by competent proof that nevertheless probable cause did exist.

This disposes of the most important of the 95 assignments of error contained in the record, with the result that the cause must be reversed and remanded for a new trial. What has been said will indicate our views upon many that remain, while others will probably not arise upon a retrial.

Reversed.