Argued October 11; affirmed October 25, 1949

# SCHEUFELE *v.* NEWMAN

210 P. 2d 573

*Howard P. Arnest,* of Portland, argued the cause and filed briefs for appellant.

*B. A. Green,* of Portland, argued the cause for respondent. On the brief were Green, Landye & Peterson and Donald S. Richardson, of Portland.

Before Lusk, Chief Justice, and Brand, Belt, Hay, and Page, Justices.

BELT, J.

This is an action to recover damages for personal injuries resulting from an alleged assault and battery. In the complaint it is alleged, so far as material herein, that defendant wrongfully and maliciously struck the plaintiff on the shoulder, jaw and face with a heavy rifle, thereby causing a laceration to his lower jaw and lip, a fracture of an upper front tooth, and an injury to the nerves and soft tissue of the chin. Plaintiff also avers that on account of this attack, he has sustained a "permanent scarring and disfigurement."

Defendant in his answer admitted that he struck plaintiff and that he sustained some injuries, but denied that he was damaged in the sum of $5,000.00, or any part thereof. As an affirmative defense the defendant alleged that he was the owner of the land where the incident occurred; that it was posted against trespass; and that plaintiff, although requested to leave the premises, refused to do so and defied defendant to put him off if "he was able to do so." Defendant further alleged in substance that when he undertook to eject plaintiff from the premises, the plaintiff resisted his efforts and that he was obliged to meet plaintiff's "opposition and force with force" and defend himself against plaintiff's "acts of resistance and belligerency."

Plaintiff in his reply denied the affirmative matter alleged by defendant.

Under these issues briefly stated, the cause was submitted to a jury and a verdict returned in favor of plaintiff in the sum of $2,037.50, general and special damages, and the sum of $2,500.00, as punitive damages. From the judgment based on such verdict, the defendant appeals.

The action arose out of the following facts. Defendant is the owner of a summer home near the confluence of Gordon creek and Sandy river about seventeen miles from the city of Portland. It is conceded that he owns land on both sides of Gordon creek and to the ordinary high water mark on Sandy river.

Plaintiff, accompanied by his wife, a few relatives, and friends, went from Portland to Sandy river on a picnic on July 4, 1946. The place chosen for picnic purposes was not on the land of the defendant. Plaintiff decided to go fishing and about eleven o'clock in the morning reached the place in question near the confluence of Gordon creek with Sandy river.

It is plaintiff's contention that he was fishing in Sandy river, below the ordinary high water mark, at the time of the alleged assault and battery and that since Sandy river was a navigable stream—as contended by him—he was not a trespasser. Defendant asserts that plaintiff was fishing in Gordon creek—an admittedly non-navigable stream—and that he was a trespasser on premises owned by him.

Plaintiff thus testified as to what occurred:

"Q. Then while you were fishing there did you hear any sounds?

"A. Yes.

"Q. Would you tell us what you heard.

"A. Well, I heard some explosions.

"\* \* \* \*

"Q. Then after you heard the explosions what happened then?

"A. Well, they were repeated, and then there was some splashes in the water.

"Q. Where were the splashes?

"A. Well, near where I was fishing."

Plaintiff testified about seeing the defendant and his son approach and that the defendant shouted that he

owned the property and for him to get off. Plaintiff answered that he was not on private property and he "didn't have to get off." As the defendant and his son approached, plaintiff testified that he saw that both of them were armed. The defendant had a regular Army rifle weighing about nine pounds. The son was armed with two revolvers.

"* * * *

"Q. Then what happened, if anything?

"A. Then Mr. Newman says, 'I am a deputy sheriff, and I order you off the river.'

"Q. Then what happened?

"A. Then I told Mr. Newman if he was a deputy to come over and show me his credentials and I would leave.

"Q. Then can you tell us in your own words what happened?

"A. Well, Mr. Newman had this big gun, and he began to waive it around a little and point it my way a couple of times, and I was getting pretty scared. But he didn't do anything, and then he pointed it into the water and shot again. And then he ordered me off again, and I insisted that he show me his credentials. So after that immediately, why, he came past Mr. Dawson, who was fishing on this little bank there, and waded across Gordon Creek and then across this branch over to where I was, so that I was facing just the reverse of what I had been, looking downstream and facing Mr. Newman and he was facing upstream."

When the defendant was two or three feet from the plaintiff:

"* * * *

"Q. What was the position of the rifle at that time?

"A. He was holding it across his front. I couldn't tell you the exact position, because I wasn't paying close attention to how he held the rifle.

"Q. What was the next thing you knew, Mr. Scheufele?

"A. Well, I was getting up off the river bank.

"Q. Were you in the water?

"A. Yes, I had sat down in the water.

"*   *   *   *

"Q. Were you in control of your senses? Did you have your faculties about you?

"A. Well, enough to insist that he show me his credentials, yes.

"Q. Did he show them to you?

"A. Yes, he did.

"*   *   *   *

"A. After he showed me his card as a deputy sheriff, why, I left, turned around and started walking back down the stream."

L. J. Dawson, who was fishing about thirty feet from the plaintiff, testified about seeing the defendant and his son approach, both being armed:

"Q. (By Mr. Peterson) What did the son say at that time and place?

"A. The son held the gun on Mr. Scheufele there that revolver—.38, .45, or what it may be—and he says 'I'll hold him there, dad, while you cross the river.' In the meantime Mr. Newman crossed the river and went over on the other side.

"*   *   *   *

"Q. (By Mr. Peterson) Would you tell us what you saw and heard?

"A. Mr. Newman went across the creek and went down to Mr. Scheufele.

"*   *   *   *

"Q. Tell us what happened?

"*   *   *   *

"A. He had the rifle about so and let it fall at about so (demonstrating), and caught Mr. Scheufele around his chin and down he went like a gored ox. Two minutes or so later he got up to his feet and

picked up his fishing basket which was upset a little way back and started on down the island \* \* \* \*."

The defendant admitted shooting the rifle once in the water about ten feet in front of the plaintiff. He denied that he ever pointed the gun at the plaintiff. Defendant testified about his military training and his knowledge of jiu-jitsu. Defendant said he approached the plaintiff and asked him again to "get off"; that the plaintiff refused to go, threw his fishing pole down, and moved his hand back toward his hip pocket.

"Q. What did you do?

"A. Reached over and tapped him on the shoulder.

"Q. What shoulder did you tap?

"A. The right shoulder. He reached with his right hand to his hip pocket.

"\* \* \* \*

"Q. Then what happened?

"A. I don't know, this happened quick. I threw this up (demonstrating) to block the blow and he *struck the butt of the rifle.*

"\* \* \* \*

"Q. He hit what; I suppose that is a strap?

"A. That is a sling swivel you call it in the Army.

"Q. Then when that happened what happened to him?

"A. He stepped back three steps, stepped on a rock, it rolled out from under his foot and he sat down. He immediately got up." (Italics ours.)

The greater part of this voluminous record—including the briefs—pertains to the question as to the legal status of the plaintiff. Was he a trespasser? Or was he at the time of the incident at a place where he had a right to be? If Sandy river was a navigable stream in the legal sense and plaintiff was standing

in its bed below the ordinary high water mark, he was not a trespasser. If plaintiff was above the ordinary high water mark or was fishing in Gordon creek, he was a trespasser and the defendant was authorized to use reasonable force to eject him from the premises.

On this appeal—viewing the record in the light most favorable to the defendant—it will be assumed, although not decided, that plaintiff was a trespasser. It does not follow, however, that the defendant would be justified in using unreasonable force to compel the plaintiff to "get off" the land merely because he was a trespasser. The use of a deadly weapon under such circumstances would be wholly unjustified. The mere fact that plaintiff was a trespasser would not justify the defendant in shooting in front of him or using the heavy gun as a club in an effort to eject him. The rule applicable is stated in *Eldred v. Burns, et al,* 182 Or. 394, 182 P. (2d) 397, 188 P. (2d) 154, as follows:

"A person aggrieved by a trespass may repel the intruder by such force as may be reasonably necessary, short of taking human life or causing great bodily harm; and if, while so doing, the trespasser commits any overt act giving the one aggrieved reasonable ground to believe himself in imminent danger of losing his life or receiving great bodily harm, he may in self-defense use a weapon, even to the extent of taking the life of his assailant, if reasonably necessary. State v. Tarter, 26 Or. 38, 42, 37 P. 53; Newcome v. Russell, 133 Ky. 29, 117 S. W. 305, 22 L. R. A. (N. S.) 724 and note; 26 Am. Jur. 273; note 25 A. L. R. 508."

Also see 4 Am. Jur., Assault and Battery, 163, § 64; 6 C. J. S., Assault and Battery, 818 § 20, c. (2). In the instant case whether defendant used unreasonable force under all the facts and circumstances was submitted to the jury as a question of fact for it to determine.

If the evidence in support of the plaintiff is true, defendant was guilty of a brutal and malicious attack. Defendant was "trigger happy" and had a warped idea of what he could do in defense of his alleged property rights. Had defendant exhibited his deputy sheriff's card before he hit the plaintiff—and not afterwards—this case in all probability would not have resulted. Firing this high-powered Army rifle in front of the plaintiff and in a recreational area was an extremely careless and dangerous thing to do. It manifested an utter disregard not only of the welfare of the plaintiff, but also of other persons who on this Fourth of July might have been picnicking in the immediate vicinity.

The court in appropriate instructions submitted the respective theories of the parties to the jury, and its verdict is amply supported by evidence.

Appellant has numerous assignments of error relative to the admission of evidence or instructions of the court which do not conform to the Rules of the Supreme Court and will, therefore, not be considered. This court has repeatedly stated the purpose of these rules and the importance of complying therewith. *Buel v. Mathes*, 186 Or. 160, 197 P. (2d) 687; *Penn. v. Henderson*, 174 Or. 1, 146 P. (2d) 760. It is deemed unnecessary to repeat what has so often heretofore been said on the subject. We reserve the right in the interest of justice to take cognizance of error not assigned in strict conformity with the rules; but in this case there has been no miscarriage of justice, and there is no occasion to waive compliance.

■ For the benefit of the Bar, we direct attention to some of the assignments of error made herein:

"Assignment of Error No. 1

"The court erred (B.E. I) in allowing the witness L. J. Dawson to testify, over defendant's objection, concerning arms carried by a son of defendant."

■ Subd. 3 of Rule 13 of the Supreme Court provides where objection to the admission of evidence has been overruled, the question and the objection made must be set forth *haec verba*. Reference to the Bill of Exceptions will not suffice.

"Assignment of Error No. 3

"The court erred (B.E. III) in permitting counsel for plaintiff to propound questions containing the expression 'high water' and to elicit answers using such term."

Does counsel for appellant expect this court to search the record to ascertain the questions asked and the answers given thereto? This we refuse to do.

There are various assignments of error based on instructions given by the court without setting forth *haec verba* the objections made to such instructions. See Subd. 3 of Rule 13 of the Supreme Court. The Rules can be found in 9 O. C. L. A. 315 and 170 Or. 715. No assignment of error complies with the rules. We have selected the above assignments merely as illustrative.

The judgment is affirmed.