[Civil No. 4148.   Filed October 22, 1940.]

[106 Pac. (2d) 495.]

F. C. BREWER and BEATRICE BREWER, His Wife, ERVEN BREWER and NORA BREWER, His Wife, R. E. SCOTT, Jr., and SAMUEL HAY-DIS, Appellants, v. J. C. HEINE, MARK SERE and C. R. ALLEN, Appellees.

Mr. Wm. H. Westover, Mr. R. N. Campbell and Mr. D. M. Campbell, for Appellants.

Mr. R. C. Bennett and Mr. C. B. Smith of El Centro, California, for Appellees.

McALISTER, J.—The plaintiffs brought an action against the six defendants named and the California Talc Company, a corporation, to establish their right to the possession of the Lodi mining claim situated in the Plomosa mining district in Yuma county, Arizona, about five miles northwest of Bouse, and from a judgment in their favor entered upon the verdict of a jury and an order denying a motion for a new trial, the defendants appeal.

The substance of the complaint is that plaintiffs are the owners and entitled to the possession of the Lodi mining claim, location notice of which was recorded on November 9, 1935, but that in January, 1938, the defendants, their agents and employees, without the consent of plaintiffs, entered upon the claim, asserted possession to the ground covered thereby and began extracting and removing from it mineral-bearing rock and since then have withheld possession thereof from the plaintiffs.

The California Talc Company filed a disclaimer but the other defendants answered alleging in substance that the property within the confines of the Lodi claim was located by F. C. Brewer and John Quick on November 30, 1929, as the White Mountain mining claim, and that through various conveyances it is now the property of defendant Samuel Haydis but in the actual possession of defendant Scott who has been operating it pursuant to an agreement of purchase with Erven Brewer, the grantor of Haydis; that from the date of the location of the White Mountain until this action was filed Haydis and his predecessors in interest have been the owners and entitled to the possession thereof, and that consequently the land embraced within its boundaries was not open unappropriated public domain in November, 1935, when plaintiffs Heine and Sere attempted to locate it as the Lodi; that the plaintiffs acquired no right to the ground in question, because they did not, in locating the Lodi claim, comply with the mining laws of Arizona and of the United States.

These allegations disclose a conflict between the Lodi and the White Mountain claims and the principal questions presented are, first, whether the land embraced within them was open unappropriated public domain when the Lodi was located, and, second, whether the

proper work was done on the Lodi to make it a valid claim.

This renders necessary a statement of the material facts. It appears from the testimony that the plaintiffs, J. C. Heine and Mark Sere, went upon the land lying within the confines of the Lodi claim early in November, 1935, and found in the way of improvements thereon a drift or cut 8 feet wide and about 50 feet long, a shaft at the top of the hill about 22 feet deep, referred to in the evidence as shaft No. 1, and a shaft or pit 4 feet by 6 feet and about 2 or 3 feet deep at the foot of the hill, 30 feet from the beginning of the cut, and referred to in the record as shaft No. 2; that they found also two posts lying on the ground, one at the northwest corner and one at the center directly south, and a small monument in which there was a location notice signed by John Quick, dated January, 1934, calling the claim the Barium King mine; that, after looking around further and finding no corners, they decided from the conditions appearing there that no work had been done on the claim for at least three or four years; that they, believing it had been forfeited or abandoned, decided to locate it; that they built a monument of stone 4 feet high and 3 feet at the base some 8 or 10 feet above the old one, placed therein a copy of the certificate of location of the Lodi claim, dated November 7, 1935, enclosed in a tin can; that they went to Yuma, looked over the records and found that the Barium King mine had not been recorded but did find records of John Quick and F. C. Brewer under the White Mountain group; that they then filed their certificate of location for record, returned to the claim around the middle of January, 1936, monumented it by putting in the ground 2½ feet at the corners and the center of the end and sidelines either crossties 6 by 8 inches and 8 feet long or posts 8 feet in length and 6 inches in diameter, and did the discovery work which

consisted of enlarging shaft No. 2 to 6 by 8 feet and then sinking it to a depth of 14 feet 7 inches, barium in place being found all the way down; that they did some trenching near by merely to follow the ore.

It appears also from the evidence that a day or so after plaintiff, Heine, who returned to the claim alone, had started the discovery work, defendant, F. C. Brewer, one of the locators of the White Mountain went where he was working and told him that the claim was his (Brewer's); that Heine replied that the records did not show it and asked him if he had done any work on it; that Brewer replied that he had not been on the property since 1932 but that the claim was exempt; that when told by Heine the records did not show this either, he answered, when asked by Heine who made out his exemption papers, Justice of the Peace Bellus at Bouse; that they went to Bouse that day to see Judge Bellus who, after examining his records, told Brewer in Heine's presence that the Barium claim was not one of the six that he had had exempted; that Heine went to Yuma and on to Calexico, California, where his co-locator Sere was at the time and returned with him after two or three days to the claim and the two of them finished the discovery work and monumented the claim within ninety days from November 7, 1935.

In the month of June, 1937, Heine and Sere performed the annual labor for the year ending July 1, 1937, by working on the two miles of road running from the Swansea highway to the claim, and on June 28, 1937, filed their affidavit of annual labor.

On March 10, 1938, Heine and Sere deeded an undivided one-third interest in the Lodi claim to plaintiff C. R. Allen.

The evidence discloses further that the White Mountain claim was located by F. C. Brewer and John Quick in November, 1929, as alleged, and through mesne con-

veyances became on January 5, 1938, the property of the defendant, Erven Brewer who, five days later or on January 10, agreed to sell it to defendant, R. E. Scott, Jr., under certain terms upon the latter's agreement to purchase it thereunder; that immediately upon the execution of this agreement Scott took possession and continued therein until March 14, 1938, when this suit was filed, and during this two-months' period mined and shipped a fairly large tonnage of barium; that on February 8, 1938, Erven Brewer deeded the claim to defendant, Sam Haydis, who is now the owner subject to the rights of Scott under his contract of purchase.

In March, 1938, plaintiffs found Scott in possession of the claim working it and immediately filed this action.

Any other facts that may be necessary in disposing of the various assignments will be stated as required.

▇ Fourteen errors have been assigned and almost as many propositions of law advanced in their support. The first complaint is that the evidence is not sufficient to sustain the verdict because plaintiffs (the parties are designated as in the trial court) failed to show that the annual labor had not been performed on the White Mountain for the year ending July 1, 1935, or that notice of intention to hold it without doing this work under the act of Congress had not been filed, and that as a result the land embraced within its boundaries became open to location. It appears that when plaintiffs, Heine and Sere, went on the claim in November, 1935, they found, according to their testimony, no monuments marking its boundaries but did observe two posts lying on the ground, one at the northwest corner and one directly south of it, and a small discovery monument in which the location notice of the Barium King signed by John Quick, dated January, 1934, had been placed. That notice was never recorded, how-

ever, and judging from the appearance of the ground no work had been done on the claim for at least three or four years. In addition, one of the locators and owners of the White Mountain, F. C. Brewer, told Heine about January 15, 1936, just as the latter was starting to do the discovery work, that he (Brewer) had not been on the property since 1932 but he claimed it because he had had it exempt from the annual labor under the act of Congress. The records did not, according to Heine, show that claim of exemption for the White Mountain for the year ending July 1, 1935, had been filed, and the person who prepared Brewer's papers for exemption on his claims for that year and made a record of them told Brewer in Heine's presence that the Barium claim, the White Mountain, was not included among those that Brewer had exempted. The statement of Brewer that he had not been on the mine since 1932 but that he had the claim exempt was an admission that the work for the year ending July 1, 1935, had not been done, and the testimony of Heine that the records did not show a claim of exemption and that Justice of the Peace Bellus, who prepared defendant's exemption papers, told Brewer in his presence he did not exempt it was a *prima facie* showing that the claim of exemption was not filed, and the failure of defendants to combat this by proving that they did file it established conclusively the fact that no claim for exemption was made. Hence, the finding of the jury that neither the work was performed nor a claim of exemption filed and that the ground embraced within the White Mountain was in consequence unappropriated public domain, subject to location on November 7, 1935, was amply supported by the evidence.

Defendants contend, however, that even though the evidence does show that the annual labor had not been performed on the White Mountain, still plaintiffs, in seeking to initiate thereon the Lodi, knew

from the monuments and other evidence found by them on the claim that someone else had theretofore attempted to locate it and that this knowledge imposed upon them the burden of establishing by clear and convincing proof that such attempted prior location was invalid and that in consequence thereof the ground was again a part of the public domain and open to location by them. If the Lodi had been located upon the theory that the original location of the White Mountain was invalid, this would undoubtedly be true, but it has no relevancy whatever where, as in this case, the later location is made upon the ground that the land was then unoccupied public domain by reason of the fact that any prior location thereon, whether the White Mountain or any other claim, had been forfeited by the failure of its owners to keep it alive by performing the annual labor or by abandonment. *Cunningham* v. *Pirrung,* 9 Ariz. 288, 80 Pac. 329. In view of this it was wholly immaterial to the plaintiffs whether the prior location was valid or invalid at its inception, and for this reason they made no attack upon it but proceeded upon the theory that it had been forfeited or abandoned, and established clearly that defendants had not performed the annual assessment for the year ending July 1, 1935, nor filed a claim under the federal law necessary to exempt them from doing the annual labor required to keep their location alive. Notwithstanding this, the court instructed the jury in effect that before defendants could defeat recovery by plaintiffs the validity of the White Mountain's original location had to appear and that the burden of showing this rested on them. An instruction, pointing out the various steps necessary under the statutes to locate a mining claim, was requested by defendants and the court gave it but after doing so added to it this language:

"Gentlemen, that applies to both the plaintiffs and the defendants in this case with equal force."

The same idea was incorporated in several other instructions and error is based on each. For instance, the court modified defendants' requested instruction No. 7 by prefacing it with these words:

"If you believe from the evidence in this case that the defendants had, prior to 1935, initiated a valid claim to the mining property here involved, then you are instructed that, etc."

And, again, the jury was instructed in this language:

"The defendant in this case must show a valid claim to the property existing at the time of the filing of the location notice by the plaintiffs in order to defeat the validity of their claim."

Inasmuch as the plaintiffs had not attacked the validity of the original location of the White Mountain but by their method of procedure had admitted it, that could not have become an issue in the case, hence, it was error to tell the jury that the validity of that location at its inception must appear before defendants could defeat plaintiffs and that the burden of showing this rested upon them. However, the error was harmless because the plaintiffs had clearly established forfeiture or abandonment and would have been entitled to a directed verdict on that issue if it had been the only one involved and a motion to that effect had been made.

▪ Defendants contend further that the court erred in entering judgment on the verdict because the evidence failed to show, first, that plaintiffs posted notice of location at or contiguous to the point of discovery of the Lodi location; second, that plaintiffs posted or recorded a notice of location showing the distance in feet from the point of discovery to either end of the Lodi; third, that plaintiffs in attempting to relocate the White Mountain sunk the original White

Mountain discovery shaft 8 feet deeper. An examination of the testimony discloses that these contentions are without merit. According to it a location monument of stone of the proper size and height was erected at or contiguous to the point of discovery and in it was placed the location notice signed by Heine and Sere. The monument, it is true, was erected 100 feet or more east of the place where the discovery work was done, but was on the claim near the vein and so conspicuous that it could be seen a mile away. This, we think, shows that the discovery monument in which the location notice was placed or posted was erected ''at or contiguous to the point of discovery.'' The term ''contiguous'' is defined by Webster's New International Dictionary as ''In actual contact; touching; also, near, though not in contact; neighboring; adjoining; near in succession.'' The two were ''near, though not in contact'' or ''neighboring'' and this placed the monument sufficiently close to the point of discovery to bring it within the meaning of the term ''contiguous.''

▇ The locators stated in their notice of location that they claimed 1500 feet along the course of the mineral bearing ledge, lode or vein, extending 750 feet in an easterly direction and 750 feet in a westerly direction from the location monument, and 300 feet on each side of the center of the ledge for the entire length of the claim. This was clearly a sufficient designation in the notice of the distance in feet from the point of discovery to either end of the claim.

▇ It appeared also from the evidence introduced by plaintiffs that they increased the size of shaft No. 2 from 4 feet by 6 feet to 6 feet by 8 feet and sank it from 2½ or 3 feet to a depth of 14 feet 7 inches. This was more than 8 feet deeper than it was before plaintiffs began work on it and, though the testimony on this point was conflicting, this was sufficient to support the

finding of the jury that they sank the discovery shaft the required number of feet.

In assignments 10, 11 and 12 the defendants complain of the ruling of the court refusing to permit their witness McReynolds to testify as to the depth of shaft No. 2 in 1929 and 1932, and as to whether in 1938 it was in a different condition from that existing in 1932. The defendants contended that the plaintiffs did not perform the required amount of discovery work on the Lodi and in an effort to establish this sought to show by their witness McReynolds that in 1929 and 1932 shaft No. 2, upon which plaintiffs did their discovery work, had a depth of 8 feet, and the court sustained objections to questions intended to bring this out upon the ground that the time was too remote. Defendants assign both rulings as error, their contention being that the evidence would have shown that shaft No. 2 was 8 feet deep when the discovery work on the Lodi was started in January, 1936, and that a depth of 14 feet 7 inches to which plaintiffs lowered it was not a compliance with the requirement that it be sunk 8 feet deeper and, therefore, the necessary discovery work was not performed. The answers should have been permitted but the refusal to allow them did not prejudice defendants' rights for the reason that the same witness testified that he was on the property in April or May, 1935, just a few months before plaintiffs were on the claim the first time; that he paid particular attention to shaft No. 2; that it was then 8 feet deep and that the only difference between its condition at that time and 1929 and 1932 was "a little gravel and stuff that had worked in from the rains." In addition to this defendants' witness Cavanaugh was on the property in 1931 and again in January, 1938, when he and others made actual measurements of shaft No. 2 which showed that it was then 9 feet 2 inches deep and he testified that there was practically no difference in

its depth then and in 1931. This gave defendants the benefit of the facts they sought by the other questions, hence the answers to them would necessarily have been cumulative.

There are several other assignments but we think they are sufficiently answered in what has been said.

The judgment of the lower court is affirmed.

ROSS, C. J., and LOCKWOOD, J., concur.