Argued April 2; reversed and remanded July 1; rehearing denied
December 23, 1947

## ELDRED *v.* BURNS ET AL.
## KINGSLEY LUMBER COMPANY, a corporation

(182 P. (2d) 397)   (188 P. (2d) 154)

*Nicholas Jaureguy,* of Portland, (Cake, Jaureguy & Tooze on brief) for appellants.

*Nels Peterson* and *James Landye,* both of Portland, (Nels Peterson and Green & Landye, and Thomas H. Tongue, III., on brief) for respondent.

Before ROSSMAN, Chief Justice, and LUSK, BELT, BAILEY, HAY and WINSLOW, Justices.

WINSLOW, J. (Pro Tempore)

This is an action to recover damages resulting from an assault and battery alleged to have been committed by the appellant Raven Blackwolf, a man 67 years of age, employed by the appellant William J. Burns International Detective Agency as a watchman to guard the waterfront property of the defendant Kingsley Lumber Company. The appellant Burns Detective Agency had entered into a contract with the Kingsley Lumber Company to guard this waterfront property and in furtherance thereof employed Blackwolf.

The respondent alleges in his complaint that on the 27th day of February, 1945, the appellant Blackwolf "wilfully and maliciously and wrongfully" shot him through the right arm causing serious and permanent injuries. The appellant Burns Detective Agency answered, admitting that respondent was shot through the arm, but denied that the shooting was "wilful, malicious or wrongful." As an affirmative defense, it was alleged that the respondent was a trespasser on the property of the Kingsley Lumber Company and that Blackwolf, the watchman, being fearful that respondent and his three companions were going to "beat and injure him," accidentally shot the respondent while defending himself and such property. The appellant Raven Blackwolf, in his answer, admitted having shot the respondent through the arm, but denied that it was done in a "wilful, malicious or wrongful" manner. As a further and separate defense, Blackwolf alleged that about midnight on the 27th day of February, 1945, the respondent, accompanied by three companions, was trespassing on the property guarded by him, and, when he called on them to stop, they advanced toward him in a threatening manner, and, being fearful that respondent and his companions were

"about to beat and injure him," and while acting in defense of himself and said property, fired the shot that hit the respondent. These affirmative defenses were denied in the reply of respondent.

On the issues thus briefly stated, the cause was submitted to a jury and a verdict returned in favor of the respondent and against the appellants Blackwolf and the copartners doing business under the assumed name of William J. Burns International Detective Agency in the sum of $39,349. No verdict was returned against the Kingsley Lumber Company.

There are several errors in the record which necessitate a reversal of the judgment rendered, chief among them being the instruction given by the court and referred to under appellants' fourth assignment of error to the effect that respondent was not a trespasser on the premises of the Kingsley Lumber Company at the time alleged in the complaint.

In order to correctly interpret this record, it is necessary to consider, from the standpoint of appellants as well as respondent, that it has a war time setting. It cannot be accurately understood without considering this background. Shortly after Pearl Harbor, the Army took over the supervising, guarding and patrolling of the Portland waterfront industries and waterfront facilities. Some time during the war and prior to the incident involved herein, jurisdiction was transferred to the United States Coast Guard.

There is much confusion in the description of the properties involved, by virtue of different witnesses having different ideas as to directions. The description used here will be based upon the hypothesis (slightly erroneous, in fact) that the river and the St. Helens road are parallel and run substantially north and south. Because of the indefiniteness of the dividing

line between properties operated by West Oregon Lumber Company and West Oregon Terminal Company, we shall refer to all of this property as West Oregon property. This property is located a short distance north of Linnton, between the St. Helens road and the Willamette River. Upon this property there is maintained a dock for the purpose of mooring, loading and unloading, barges, ships and other water carriers. The entrance to this property was by a main gate a short distance east of the St. Helens road.

Immediately to the south of the West Oregon property was the Kingsley property where the Kingsley Company operated a saw mill, planing mill and dry kiln, and an office. The entrance to this property crosses over a railroad track and proceeds easterly onto the property. The office is immediately to the left of this entrance. There is, between the two properties, a monorail, or crane structure, with a passageway about half way across the properties. At the time involved, there were maintained at this passageway, both on the Kingsley property and on the West Oregon property, signs reading: "Warning. Do not trespass. Enter these premises at main gate only. Order of U. S. Coast Guard." The Kingsley property did not have a dock although the property bordered upon the river and at times scows were loaded therefrom. At the entrance of the Kingsley property was a sign reading: "No admittance. Stop at office."

On February 27, 1945, the night of the shooting, the Kingsley property was being guarded until 12:00 o'clock midnight by one Anton Anderberg. Raven Blackwolf was to relieve Anderberg at midnight and arrived at the office on the Kingsley property a short time before 12:00 o'clock for that purpose. On the

same night, the West Oregon property had a Burns representative at the gate for the purpose of identifying and admitting those entitled to enter. Two Coast Guardsmen were patrolling the dock having come on duty at 6:00 o'clock and were to serve until midnight. There was, at the time, moored at the dock the S. S. St. Cloud Victory. There was maintained, at the gangway to the vessel, a Pinkerton guard who identified and permitted those who were entitled to do so to go aboard.

The Coast Guard regulations, Code of Federal Regulations for the United States of America (1944 Supp.), Title 33, Navigation and Navigable Water, Chapter 1, Part 7, Regulations for the Protection of Waterfront Facilities, promulgated by the Navy Department, commencing at page 3174, set forth the rules and regulations governing the Coast Guard with reference to its connection with waterfront facilities. These regulations provide: ''§ 7.1. Purpose. The regulations contained in this part are promulgated for the protection of vessels, harbors, ports and waterfront facilities. * * *'' The enforcement of these regulations is under the direction and control of the Captain of the Port. These regulations require all waterfront facilities to maintain guards and to instruct those guards, provide the qualifications of the guards, and provide that these guards must be satisfactory to the Captain of the Port. These regulations likewise provide who may enter and under what circumstances a person may enter waterfront facilities. These regulations, however, shed no light upon the duties or functions of members of the Coast Guard themselves when patrolling docks or other waterfront facilities.

Respondent was a young man 23 years of age, weighed approximately 230 pounds, and was six feet

two and a half inches in height. He was a member of the United States Merchant Marine.

On February 19th he signed on the liberty ship, the St. Cloud Victory, as bo'sun, and, on the night in question, was serving on board as a part of what he termed "a security watch." During the evening, he, being the "boss" as he termed it, secured a substitute for himself, and he and a "fellow seaman" by the name of Gill went to Linnton. There they met Piel, another member of the crew, who had been drinking, and they joined him and had three or four beers.

The three of them then started for the vessel. It was shortly before midnight. Instead of going to the main entrance of the West Oregon property, they attempted to go through the Kingsley property. As they attempted to enter, they were stopped by the guard then on duty, Anton Anderberg. Some argument ensued, and both Anderberg and Blackwolf demanded that they leave the Kingsley property. Blackwolf followed them west to the railroad track where further argument ensued regarding their right to go north on the railroad track. During this argument, Blackwolf contends that Piel struck at him, and it is admitted that he, Blackwolf, struck Piel with his revolver. Respondent and his associates left and shortly thereafter returned to their vessel, the St. Cloud Victory. At 12:00 o'clock Blackwolf relieved Anderberg as guard on the Kingsley property.

A few minutes before midnight, Forrest Yeoman and Eugene Boynton, who were members of what was called the Auxiliary or Temporary Coast Guard, arrived at the West Oregon dock in a jeep for the purpose of relieving two other Coast Guardsmen who had been patrolling that dock since 6:00 o'clock of that

evening. These Auxiliary Coast Guardsmen were citizens of Portland pursuing regular vocations, who had volunteered to assist the Coast Guard in supervising the waterfront facilities in Portland, and who had taken a short course with reference to the work of the Coast Guard, and were now serving one night a week. As Yeoman and Boynton arrived to relieve the other Coast Guardsmen, they were informed of the difficulty occurring a short time before on the Kingsley property between respondent and his associates and the Kingsley guards. They went on board the vessel, contacted respondent and requested respondent and Gill to accompany them back to the place of the difficulty, and started out to investigate the earlier incident. As they approached the office on the Kingsley property, Blackwolf, being then on duty, asked them who they were and told them to get out. They claim that they called back to Blackwolf that they were the Coast Guard and wanted to talk to him, and proceeded to approach the office. Blackwolf again challenged them. They continued to come. Blackwolf fired two shots, one of them striking respondent in the right arm just below the shoulder inflicting the injury for which he seeks redress herein.

The most important assignment of error has to do with the instruction given by the court to the effect that respondent was not a trespasser on the Kingsley property at the time of the shooting. This instruction is covered by appellants' assignment of error No. 4, and is as follows:

"The question as to whether or not plaintiff was a trespasser on the Kingsley Lumber Company is withdrawn from your consideration and forms no issue to be considered or determined by you, because from the evidence here and as a matter of law the

court instructs you that the plaintiff was not a trespasser upon the premises of the Kingsley Lumber Company at the time alleged in the complaint.''

The transcript contains over four hundred pages of testimony, most of which is devoted to the question of whether or not respondent was a trespasser at the time of the shooting. The briefs contain over four hundred pages of printed matter, most of which pertains to this same question. We shall, therefore, give the question our first attention.

Was respondent a trespasser? Why was he at the place of the shooting at the time of the shooting? What justification could he have for being there? It is claimed that he was asked to go there by Yeoman and Boynton. What right did they have to be there? Let us consider the record with reference to these questions.

We have examined the Coast Guard regulations referred to above, together with several volumes of additional regulations. These regulations cover the authority of the Coast Guard from a general standpoint.

Under certain circumstances, the Captain of the Port could and did send Coast Guardsmen onto the Kingsley property, in the day time, for the purpose of investigating fire conditions. But Yeoman and Boynton were not sent there for that purpose. They were sent to the West Oregon property for the purpose of patrolling its docks. They had nothing to do with anything else. They had nothing to do with admitting people to those premises. That duty was performed by a Burns representative at the gate where they themselves were required to be identified before entering. They had nothing to do with the vessel moored at the dock, the St. Cloud Victory, boarding of which was

under the jurisdiction of the Pinkerton Agency. They had nothing to do with the Kingsley property. That was being guarded by Anderberg and Blackwolf. In short they were sent to the West Oregon property to patrol its docks—nothing more, nothing less.

They arrived in a jeep a few minutes before midnight and relieved the two other Coast Guards assigned to the same duty. At the time of the change, they were informed of the difficulty which had occurred a short time before involving respondent, Piel and Gill. The city police had already been notified. They had been out and were just leaving when Yeoman and Boynton arrived. Notwithstanding this fact, and notwithstanding the further fact that Yeoman and Boynton were assigned solely to patrol the West Oregon docks, they, shortly after they "started around our beat," abandoned their assignment, went on board the St. Cloud Victory and talked to plaintiff, Piel and Gill regarding the earlier difficulty. They then, instead of returning to their patrol, requested respondent and Gill to go with them to make an investigation. They were asked upon cross-examination what authority they had and admitted that they had none except to report to their base. Yeoman testified: "We were supposed to find out anything happening like that, and report it to the base, and we just figured that something like that should be reported and we should investigate it." This whole unfortunate affair was caused by two well-meaning, patriotic young men who "figured that something like that should be reported and we should investigate it." If it was at all necessary for them to report the earlier incident to their base, they then and there had information sufficient to enable them to do so. The guards they were relieving had not thought it necessary. Certainly no one would contend

that they had any authority at that time of night to try out any question of fact, or to perform any other judicial function in a determination of who was right and who was wrong in connection with the earlier incident.

Let us not forget this war time setting of these events. The air was permeated with alertness. These Coast Guard regulations provide that these Kingsley guards should be instructed in their duties by the owner of the facility. Code of Federal Regulations for the United States of America (1944 Supp.), Title 33, Chapter I, Part 7, § 7.23. Blackwolf had been instructed in accordance therewith to admit no one to the Kingsley property. It was midnight. The plant was not in operation at that time. There was no occasion for anyone to enter. These war time regulations explain why Blackwolf was at the Kingsley property armed with a deadly weapon. What for? To keep out intruders in accordance with his instructions. They explain why a Burns representative was at the gate admitting no one, except those who were qualified and identified. They explain why the Pinkerton representative was admitting no one to the St. Cloud Victory, except those who were entitled to go aboard. They explain why Yeoman and Boynton were assigned to patrol the West Oregon docks.

The waterfront was completely organized, guarded and patrolled. Everyone connected therewith had a duty to perform. If everyone performed the duty assigned, the wheels of a vast war time industry would synchronize. If any one of those agencies deviated from its assignment to go on an excursion which it "figured ought to be attended to," it would lead to confusion and chaos. It would make it impossible for

any one to effectively guard his property. It would naturally lead to unfortunate affairs like the one involved herein. To construe these regulations as giving these Coast Guards the right to leave their assignment and go out on their own at midnight to investigate any of the other agencies, would defeat the very purpose of the regulations.

■ Yeoman and Boynton had no right to go on the Kingsley property to investigate or perform any other duty then assigned to them, and, consequently, they had no authority to request respondent to accompany them to that place for any purpose. They were all trespassers. 52 Am. Jur., Trespass § 12, p. 844; 63 C. J., Trespass § 12, p. 894; § 8-312, O. C. L. A. It was error for the court to instruct the jury that respondent was not a trespasser.

■ It is contended by respondent that, even though it was error to so instruct the jury, the error was harmless. This contention is based upon the proposition that the mere fact that respondent was a trespasser did not justify Blackwolf in shooting him. This proposition is well established by the authorities, and we so hold. The rule applicable to this case may be stated as follows: A person aggrieved by a trespass may repel the intruder by such force as may be reasonably necessary, short of taking human life or causing great bodily harm; and if, while so doing, the trespasser commits any overt act giving the one aggrieved reasonable ground to believe himself in imminent danger of losing his life or receiving great bodily harm, he may in self-defense use a weapon, even to the extent of taking the life of his assailant, if reasonably necessary. *State v. Tarter,* 26 Or. 38, 42, 37 P. 53; *Newcome v. Russell,* 133 Ky. 29, 117 S. W.

305, 22 L. R. A. (N. S.) 724 and note; 26 Am. Jur. 273; note 25 A. L. R. 508.

Let us again take a glimpse at the situation at the time of the shooting. Yeoman testified that as the four of them approached the office on the Kingsley property, the light in the office went off and that Blackwolf "hollered out and wanted to know who we were, and 'Get off of there.'" He then said that he called out, "This is the Coast Guard. We want to talk to you." They continued to approach the Kingsley office and, as they "swung around," respondent and Gill were in the lead and the two Coast Guardsmen were a short distance behind. Continuing, Yeoman testified:

"* * * Blackwolf stuck his head out of the door again and hollered, 'Get out of here, all of you.' And I said, 'This is the Coast Guard. We want to talk to you.' And he said, 'I don't give a damn who it is. Get out of here, all of you.' And it was just 'Bang! Bang!' And Mr. Eldred (respondent) spun around, and it hit him, and he spun around, and he says, 'Go on; get out of here, you fellows. He's got me.'"

Blackwolf's version is quite different. He testified that he saw the four men approaching the office about 43 feet away and that he "called to them and asked them where they were going." Whereupon, "the tallest of the four (respondent) said, 'It is none of your damn business where we are going.' I said, 'What do you want?' He said, 'We want you.'" He further testified that when the man came around in front of the office, he called again for them to stop but they refused to do so. "I said, 'What do you want?' They said, 'We want you.'" Blackwolf said they kept on coming. He further testified that there was "a small arc light that gleamed just past the corner of the build-

ing and struck the man (respondent) about his waist, from there on down. The gleam flashed on a gun that this man was carrying in his right hand.'' Blackwolf testified:

> ''When I saw the gun I pulled my gun from the scabbard in this position (indicating). I shot, not meaning to hit anybody, and aiming it as a warning shot to halt him. At the report of the first shot the two men in the lead started and ran up the driveway south towards the St. Helens Road.
>
> ''As they crossed the railroad tracks, one of the two gentlemen knelt down as though he was trying to shove something under the end of the planks of the driveway.''

■ To instruct the jury that respondent was not a trespasser as a matter of law was to remove entirely from its consideration the effect upon Blackwolf, whatever that may have been, of the failure of respondent and his aides to stop when challenged. It was tantamount to instructing the jury that respondent et al. did not need to stop, that they had a right to proceed, without disclosing their identity, if Blackwolf's testimony is to be believed. Such a doctrine would be dangerous to society in peace time, and more especially in time of war. The act of trespass was an act of aggression which the jury was entitled to consider along with all the other evidence on the question of whether Blackwolf had reasonable ground to believe himself in such personal danger as to justify the use of a weapon. The instruction was not only erroneous, but was prejudicial.

Counsel for respondent, in support of their position that the Coast Guards had authority to go on the Kingsley property to investigate and to request respondent to accompany them, call our attention to

*Wright v. White,* 166 Or. 136, 110 P. (2d) 948, 135 A. L. R. 1, and the extended note commencing on page 10, and particularly to cases cited beginning at pages 19 and 37. The gist of these cases, as well as other similar cases, is well summarized by the author of the note at page 37 as follows:

> "Recognition of the peculiar necessity of discipline in the military service and of the position in which the subordinate may find himself through no fault of his own, in the event that commands of his superiors clash with the civil authority, has led courts in well-considered cases to regard obedience to a military order as a justification for conduct which would otherwise give rise to civil or criminal liability, unless the order is so palpably unlawful that a reasonable man in the position of the person obeying it would perceive its unlawful quality."

The cases are not applicable. Here discipline required that Yeoman and Boynton perform the duty assigned to them—to patrol the West Oregon docks. Here the Captain of the Port was not called, nor were any regulations produced to sustain the contention that Yeoman and Boynton should have been subject to discipline had they not made this investigation. This is not a case where Coast Guardsmen are claiming an exemption from liability because, under orders, they violated some law of civil authority. Here respondent seeks redress for injuries received while with the Coast Guardsmen. The issue here was: What effect did this trespass or act of aggression have on Blackwolf when he fired the shot inflicting the injury? Did it, together with other circumstances present at the time, give him reasonable ground to believe that he was in danger of receiving great bodily harm?

■ Again, it is contended that "the question of tres-

pass was only material to the issue of whether Black-wolf shot in defense of property and upon withdrawal of that defense it ceased to have any bearing on the case." This contention is based upon a misconstruction of the record. The effect of what counsel for appellant said was that they did not contend that the shooting was justified in defense of property. This did not have the effect of taking out of the case the question of trespass, nor was it so construed by any of the parties. The authorities cited by respondent do not sustain his contention.

Much space is devoted in the briefs of the parties to the question of whether or not the Kingsley property was a waterfront facility. Taking into consideration the war time setting of these events, we are considering this case from that standpoint although the question is a close one.

Respondent cites Title 33 Code of Federal Regulations (Cum. Supp.), Chapter I, Part 8, § 8.1201, in support of his contention that Yeoman and Boynton had authority to make arrests. The regulation not only fails to sustain this contention, but Yeoman testified positively that they had no such authority.

*Brown v. Cain,* 56 F. Supp. 56, is cited to the same effect. This case is most interesting. There the temporary Coast Guardsmen were guarding a war time industry at Chester, Pennsylvania. Their duties included the "suppression of disturbances which might cause damage to machinery and equipment or affect the security of the plant." The guards were attacked by a mob and a riot ensued. One of the guards shot and killed one of the leaders of the mob. The court held "that any act done by Brown which was reasonably necessary to quell a riot * * * was done in the performance of

his duty." Translated to this case that means that, if Yeoman and Boynton had been on guard duty and had a riot occurred in their presence which threatened the safety of the property they were guarding, they would have had authority to quell the riot, and, if it was reasonably necessary, could take human life to accomplish that purpose. The doctrine there taught rather tends to fortify Blackwolf's position than that of Yeoman and Boynton.

It is contended that Yeoman and Boynton had implied authority to go on the Kingsley property to make this investigation, that it was essential to the accomplishment of the main purpose of their assignment. Many authorities are cited in support of this position. The rule applicable is thus stated in 46 C. J., Officers § 301, p. 1035:

"The duties of a public office include those lying fairly within its scope, those essential to the accomplishment of the main purpose for which the office was created, and those which, although incidental and collateral, serve to promote the accomplishment of the principal purposes. * * *"

Section 327, at page 1043, should be read in connection with this statement: "When a public officer goes outside the scope of his duty, he is not entitled to protection on account of his office, but is liable for his acts like any private individual." The investigation of the Coast Guardsmen on the Kingsley property was neither incidental nor essential to the accomplishment of the main purpose of the duties assigned to Yeoman and Boynton. Their action is governed by the latter section.

The contention is made by respondent, and much authority is cited in support thereof, that "If a trespass on property is accomplished by acts that amount

to an assault upon the owner, such as would warrant him in exercising the right of self-defense, then the force he may use will be governed by the rules applicable to the right of self-defense.'' This contention is stated in the language of 4 Am. Jur., Assault and Battery § 63, p. 162, and correctly states the rule. But no case has been cited, and we have found none, holding that, in applying the rules of self-defense and determining whether or not the one defending himself had reasonable ground to believe that he was in danger of receiving great bodily harm, the first act of hostility, to-wit, the trespass, becomes immaterial.

In their efforts to justify the presence of Yeoman, Boynton and respondent at the time and place of the shooting, it is suggested by counsel for respondent that since Yeoman, Boynton and respondent had reasonable grounds to believe that Blackwolf had committed the felony of assault with a deadly weapon by striking Piel with his gun, they had a right—even as private citizens—to go to the Kingsley property to arrest Blackwolf. This contention cannot be sustained. The cross-examination of these parties makes it abundantly and conclusively clear that they did not go there for that purpose.

Again, respondent contends that appellants are estopped from claiming that he was a trespasser and that any error in the instructions on that subject was invited. This position is predicated upon the theory that when appellants withdrew the defense of property, the issue of whether or not respondent was a trespasser was thereby eliminated from the case. We have already pointed out that that contention is based upon a misconstruction of the record. The issue regarding respondent being a trespasser was never withdrawn. It had to be

disposed of by the court, and it was not inviting error to ask the court to do so.

Appellants predicate error on the rejection of the following offer of proof by witness Harleigh Glass, an employee of the Burns Agency, who worked as a watchman at the Tidewater Oil Company office:

"* * * that (Glass) left there about 11:30 P. M., when three young men, whom he would describe sufficiently for identification, to identify them as the plaintiff Eldred and his two companions, went to the Tidewater office, and a few minutes later they came out, and when they reached the road junction with the Kingsley road 'they all three stopped and hollered and kept hollering all the time I was there, ''Come up, you dirty son of a bitch, and bring your gun with you. Come up and fight like a man. Bring your gun and we will break it off in you,' and other remarks of a similar nature. They were still yelling when my bus came along and picked me up. I was about 35 or 40 feet from them. I did not know they were yelling at our guard at Kingsley, but believe they were within hearing distance from the Kingsley office if anyone had been outside the office. I knew nothing of any trouble having taken place at Kingsley's, but thought they were scrapping with some of their own men who were out of my sight.' "

■ The witness was not present at the time the showing was made, and it is not at all clear that the same question will present itself in the same form upon a retrial. The court sustained the objection to the offer of proof because the threats were not communicated to Blackwolf. In this respect the court was in error. Evidence of such threats, even though uncommunicated to the latter, would be admissible to show a hostile state of mind. *State v. Rader,* 94 Or. 432, 186 P. 79; *State v. Doris,* 51 Or. 136, 94 P. 44, 16 L. R. A. (N. S.)

660; *State v. Thompson,* 49 Or. 46, 88 P. 583; *State v. Tarter,* supra.

■ Again, it was error to receive the testimony as shown by appellants' sixth assignment of error with reference to respondent's Coast Guard identification card, and likewise the evidence shown by appellants' seventh assignment of error having to do with respondent's "ship's pass." All of this was objected to on the ground that it was immaterial. It was immaterial. It did not give respondent the right to cross the Kingsley property. The record is clear in this case that the vessel, the St. Cloud Victory, was moored at the dock of the West Oregon Company and that there was a regular gate for admitting people to and from those premises.

The rules and regulations referred to provide:

"§ 7.25. Basic requirements. No person shall enter upon or be permitted to enter any waterfront facility unless he shall possess all of the following:

"(a) A Coast Guard identification card * * *.

"(b) Any of the following kinds of passes: * * *

"(5) A pass when approved by the master, senior deck officer on duty, or representative of the owner in a position of authority of a *vessel moored at the waterfront facility.*

"(c) A legitimate reason for seeking entrance to the waterfront facility at that particular time. * * *" (Italics supplied.)

Respondent had no legitimate reason for seeking entrance to the Kingsley property at the particular time. The place for him to enter the waterfront facility at which his vessel was moored was at the gate of the West Oregon property. He was clearly a trespasser attempting to cross the Kingsley property. Counsel contend that a seaman might have to cross

other property than the one at which the vessel was moored in order to get to and from the same. Certainly no vessel will be moored at any waterfront facility where there is no means of egress or ingress. If the seaman follows the course provided for such purpose, he will bring himself within the regulations. He will have "a legitimate reason for seeking entrance" thereto. Certainly no one would contend that seamen from all the vessels moored at all the waterfront facilities, who had a Coast Guard identification card and a "ship's pass," could roam the waterfront facilities promiscuously. To permit this would defeat the very purpose of these war time regulations and all of the war time effort to guard and protect a war time industry.

It is not deemed necessary to further indicate the particulars wherein the trial court entertained views of the law differing from those herein expressed, or advert to other errors assigned by appellants, as the same questions are not likely to arise on a new trial. The judgment of the circuit court is reversed, and the cause is remanded for a new trial.

BELT, J., dissenting:

The reversal of the judgment in this case is not justified and does not square with my sense of justice. It is conceded that Blackwolf shot the plaintiff. Why did he shoot him? In the answer to the amended complaint, various reasons are assigned, viz: (1) Plaintiff was a trespasser; (2) Blackwolf shot in defense of property and person; (3) Blackwolf accidentally shot the plaintiff. During the course of the trial, however, the defense of property was withdrawn. Blackwolf held to the theory that the shooting was accidental,

but counsel for appellants very properly conceded that the sole issue was self-defense. The contention of Blackwolf that the shooting was accidental is untenable as a matter of law. *State-v. Trent,* 122 Or. 444, 252 P. 975. If Blackwolf was not justified in shooting in self-defense, he was engaged in an unlawful act when he pointed the revolver in the general direction of plaintiff and is presumed to have intended the natural consequences of such unlawful act. § 25-104, O. C. L. A. Nor did the theory of defense of property have any support in law. Hence, appellants were forced to make a last-ditch stand based solely on self-defense. Notwithstanding the single issue involved, it would seem from the opinion of the court that the case was really to determine whether the plaintiff was a trespasser and whether some federal rule or regulation had been violated by members of the United States Coast Guard. I respectfully submit that the vital issue is whether Blackwolf, at time of shooting the plaintiff, had reasonable grounds to believe that it was necessary for him so to act in order to avoid imminent danger to his life or of great bodily harm. Who was the aggressor? Was it the plaintiff? Or was it Blackwolf? These are the vital questions in this case.

Before considering the assignment of error on which the reversal is based, it is well to review briefly the testimony of Blackwolf concerning the shooting. It is indeed, a preposterous story.

Blackwolf testified on direct testimony:

"When I saw the gun I pulled my gun from the scabbard in this position (indicating). I shot, not meaning to hit anybody, and aiming it as a warning shot to halt him. At the report of the first shot the two men in the lead started and ran up the driveway south towards the St. Helens Road.

"As they crossed the railroad tracks, one of the two gentlemen knelt down as though he was trying to shove something under the end of the planks of the driveway.

"I then turned to the two (Coast Guardsmen) in the rear, which was starting to shuffle towards me. I called to them to stop. They didn't stop. I lowered the muzzle of my gun and shot about six feet ahead of them in the ground."

On cross examination:

"Q. I thought you demonstrated here just a moment ago that you fired the first shot with the pistol in the air like that (illustrating).

"A. Yes, sir; in this position (illustrating).

"Q. In that position. *And so you fired in the air; is that correct?*

"A. *Yes, sir.*

"Q. Now, what happened when you fired that shot in the air?

"A. The two in the lead started and ran, – – – –
\* \* \*

"Q. Did one of them spin around?

"A. No sir.

"Q. And they just turned and ran?

"A. Just turned and went, yes.
\* \* \*

"Q. What happened to the two men that were in the rear?

"A. When I turned to them in the rear they were shuffling toward me, starting to come toward me.

"Q. They didn't stop at the first shot?

"A. No.

"Q. And then whom were you watching at that time?

"A. I was watching the two that was in front, watching the man who stooped down as though he was shoving something under the end of the planks.
\* \* \*

"Q. All right. And they ran up there 75 feet, and then you say you watched one of them kneel down and (steal) something under the railroad track?

"A. Yes, he knelt down as though he was shoving something under the driveway.

"Q. Now, when you looked back where were the two Coast Guardsmen?

"A. They weren't standing there. They were starting to walk towards me.

\* \* \*

"Q. And then what did you do?

"A. I called to them to stop.

\* \* \*

"Q. What happened next?

"A. They didn't stop, and I lowered the muzzle of my gun and shot in the ground about six feet ahead of them.

\* \* \*

"Q. You say you could fire two shots?

"A. I did fire two shots.

\* \* \*

"Q. Mr. Blackwolf, you are not now saying that the second bullet that you fired struck Claude Eldred, are you?

"A. The second bullet was back towards the two in the rear. I don't know which one the bullet was. I don't unless it hit something and *bounced back and hit him.*

"Q. Bounced back and hit Claude Eldred?

"A. That is the only way I know the second bullet could have hit him.

\* \* \*

"Q. Do you think the second bullet did hit him?

"A. I say if it did. I say if it did it bounced back and hit him. That is the only way the second bullet could have hit, I say, if it bounced back and hit him.

\* \* \*

"Q. Well, Mr. Blackwolf, you positively know that Mr. Eldred was not there when you fired the second shot. Isn't that correct?

"A. Yes, sir; he wasn't there."

The testimony of Blackwolf concerning the shooting is repudiated by his own counsel, as in the brief of appellants it is said: "Blackwolf fired twice, the *first shot hitting Eldred's right arm.*" Blackwolf, it will be remembered, says he fired first in the air. All witnesses, except Blackwolf, testified that plaintiff had no gun. All witnesses, except Blackwolf, testified that as the plaintiff approached Blackwolf, he kept his hands in his pockets and said nothing. When plaintiff was taken to the hospital, it was necessary to cut the pocket away from his right hand. If, as Blackwolf says, plaintiff had a gun in his hand, how did he put his hand in his pocket after having been shot? In view of the shattering of the humerus bone by this heavy caliber revolver, it would have been a physical impossibility for plaintiff to have put his right hand in his pocket.

Blackwolf testified that after the first shot, plaintiff and his companion turned and ran toward the railroad track, about 75 feet away, and that "one of the two gentlemen knelt down as though he was trying to shove something under the end of the planks of the driveway." When the police came to investigate the shooting, Blackwolf never took them to show where he thought a gun was planted. He never looked for the gun. He did not believe any gun was put under a plank; otherwise, he would have looked for it.

I concede that there is sufficient evidence to justify submission to the jury of the issue of self-defense, but it is of such flimsy character—and the testimony of

Blackwolf, in many particulars, is so unreasonable—that it challenges the credulity of any reasonable-minded person. It is not strange that the jury refused to believe Blackwolf.

I am unable to agree that the judgment should be reversed because of the giving of the following instruction: "The question as to whether or not plaintiff was a trespasser on the Kingsley Lumber Company is withdrawn from your consideration and forms no issue to be considered or determined by you, *because from the evidence here and as a matter of law the court instructs you that the plaintiff was not a trespasser upon the premises of the Kingsley Lumber Company at the time alleged in the complaint.*" To this instruction, appellants took the following exception:

"These defendants except to the instruction of the Court that in this case the plaintiff was not a trespasser upon the property of the Kingsley Lumber Company, on the ground, first, that the evidence shows that he was a trespasser, second, that the regulations upon which we understand the Court relies apply only to waterfront facilities which are defined as docks, piers, wharves, and structures thereon or contiguous thereto, and third, we except to it on the ground that if the Court was correct in so instructing the Court should have gone further and instructed the jury that the fact that plaintiff was not a trespasser does not in any way excuse any wrongful acts that the evidence shows or might show that the plaintiff did."

The above instruction is subject to criticism in that it tends to divert the attention of the jury from the vital issue of self-defense, but it was not prejudicial to appellants. Furthermore, appellants are in no position to complain.

In view of the withdrawal of the defense of property, what difference did it make whether plaintiff was a trespasser so far as the issue of self-defense is concerned? If he was a trespasser—and I think he was not—Blackwolf would not by reason thereof be justified in shooting him. The law does not countenance the use of a deadly weapon for such purpose. *State v. Bartmess,* 33 Or. 110, 54 P. 167; *Sherrill v. Naylor,* 29 Ala. App. 103, 193 So. 182; *Newcome v. Russell,* 133 Ky. 29, 118 S. W. 305, 22 L. R. A. (N. S.) 724 and annotation; *Newman v. Southern Kraft Corporation,* (La.), 197 So. 197; *Schmitt v. State,* 57 Okla. Cr. 102, 47 P. (2d) 199; *Fore v. Commonwealth,* 291 Ky. 34, 163 S. W. (2d) 214. See also 25 A. L. R. 525-560, annotation. Regardless of the legal status of plaintiff, the real question is whether he did anything to cause Blackwolf to have reasonable grounds for believing that he was in imminent danger of his life or of great bodily harm. What if he was a trespasser, would that fact have any material effect on the mind of Blackwolf in causing him to believe that he was in such danger? Would any juror of ordinary intelligence infer from the instruction given that plaintiff was authorized to become an aggressor? The court, in its instructions, fully and accurately covered the law of self-defense, and there were no exceptions taken thereto. The court instructed, among other things, that in determining the plea of self-defense, the "jury has a right and it is their duty to take into consideration *all the facts and circumstances in evidence.*" Appellants' rights were not substantially affected by the instruction relative to trespass. It is highly improbable that the jury in reaching its verdict took into consideration the many niceties of law relative to trespass which the court has stressed in its opinion.

I am not unmindful of the well established rule that any evidence tending to show a hostile state of mind of the plaintiff would be admissible where self-defense is involved. It is more probable that a person having a hostile mind would be an aggressor than one entertaining a friendly feeling. Therefore, evidence of threats indicating ill-will is admissible whether or not communicated to the person charged with assault and battery. In the instant case, however, there is absolutely no evidence that plaintiff ever made any threats against Blackwolf. There is no charge of conspiracy. Whatever threats, if any, made by Piel or Gill—not acquiesced in by plaintiff—are not admissible against the latter where self-defense is in issue. *State v. Quen,* 48 Or. 347, 86 P. 791.

Even if plaintiff was a trespasser, does that fact indicate such a hostile state of mind that a jury could reasonably infer therefrom that he was an aggressor? There has been no authority cited, and none has been found, holding that the question of trespass is relevant in a case where the sole issue is self-defense.

*People v. Doud,* 223 Mich. 120, 193 N. W. 884, 32 A. L. R. 1535, strongly supports the contention that the instruction given, and that requested by appellants, pertaining to the question of trespass was foreign to the issue. In this case, Doud was charged with assault with a deadly weapon. A controversy arose over the dividing line between the defendant's land and land owned by the state of Michigan. The state park superintendent sent men on the premises to erect a fence upon what he claimed to be the true line. The defendant ordered the men off and threatened to shoot one Davenport if he did not get off the land claimed by the defendant. At the trial, defendant wanted to show,

as justification of his acts, where the true line of the property was and that the fence builders were trespassers. The trial judge declined to entertain the proposed issue. On appeal, this ruling was urged as error. The court, refusing to sustain such contention, said: "Suppose the fence builders were clearly shown to have been trespassers, what effect would that fact have had on the real issues? None. No man may, in defense of his mere land against trespassers, assault the invaders with a dangerous weapon. The law forbids such a menacing of human life for so trivial a cause." See also *Lamb v. Stone,* 95 Wis. 254, 70 N. W. 72.

If plaintiff was a trespasser and his trespass had been accompanied by an act of violence causing Blackwolf to have had reasonable apprehension that he was in imminent danger of his life or great bodily harm, the justification for the shooting of the plaintiff would be based on defense of Blackwolf's person and not on defense of the property which he was guarding. 4 Am. Jur., Assault and Battery, §§ 63 and 71.

Appellants complain in their exception to the instruction given that, if the same was correct, the court should have gone further and instructed the jury that "the fact that plaintiff was not a trespasser does not in any way excuse any wrongful acts that the evidence shows, or might show, that the plaintiff did." However, appellants requested the court to instruct the jury that the plaintiff was a trespasser as a matter of law, without any limitation or qualification thereof. If the instruction requested by appellants had been given, a juror might well have inquired, "Are we to infer that, if plaintiff was a trespasser, Blackwolf had the right to shoot him?" Obviously, it would have been

the duty of the court to have instructed, as a matter of law, that the mere fact that plaintiff was a trespasser would not of itself be a justification to shoot for the purpose of ejecting him from the premises. As before stated, appellants are in no position to complain.

In my opinion, Yeoman and Boynton, as members of the United States Coast Guard, had the right to go upon the Kingsley Lumber Company property to make an investigation concerning the attack on Piel who was a member of the United States Merchant Marine. The evidence is uncontradicted that these two Coast Guardsmen requested the aid of the plaintiff in making this investigation. There is nothing improbable or unreasonable about the testimony of these disinterested witnesses, and the court should give full credence to the same. Notices were posted on the Kingsley property warning people not to trespass thereon, "By Order of the United States Coast Guard". It seems ridiculous to me that the United States Coast Guard, having such authority, would not also have authority to go upon such premises to investigate a matter of this kind. It was the duty of the Coast Guard to administer the rules and regulations to which attention has been directed by the court, but these rules and regulations do not purport to prohibit the United States Coast Guard from making an investigation concerning a matter involving the welfare of the United States Merchant Marine, engaged as it was in the important work of transporting war materials.

The regulations, assuming that they apply to the Coast Guard, did not prohibit Yeoman and Boynton from going on this waterfront property. Under this Code of Federal Regulations, Title 33, Chapter I, Part 7, 9 F. R. 3461), the term, "waterfront facilities" is

defined to include "* * all piers, wharves, docks, or similar structures to which vessels may be secured, buildings on such structures or contiguous to them * *." It is true that there was no pier, wharf, dock, or similar structure on the Kingsley property, but it had facilities for the moorage of barges, and barges were occasionally loaded there. The Kingsley property was "contiguous" to property having "waterfront facilities". It will be recalled that the Kingsley property was adjacent to the dock of the West Oregon Terminal Company where the St. Cloud Victory was moored. In my opinion, the term "contiguous" was used in the regulation in a broader sense than that insisted upon by appellants. To give the term too narrow or strict a meaning would defeat the purpose of the regulation. The word "contiguous", as thus used, means "but also near, though not in contact; neighboring; * *." Webster's New International Dictionary (2nd. ed., unabridged). To the same effect, see *Brewer v. Heine*, 56 Ariz. 160, 106 P. (2d) 495; *State ex rel. Grays Harbor Boom Co. v. Sup'r. Ct.*, 57 Wash. 698, 106 P. 481; *Mitchell v. Melts*, 220 N. C. 793, 18 S. E. (2d) 406; *Northern Pacific R. Co. v. Douglas County*, 145 Wis. 288, 130 N. W. 246.

George A. Kingsley, Manager and Vice-President of the company, testified that the property in question was "waterfront property" and had loading facilities for barges. He also testified that since Pearl Harbor this waterfront property had been taken over from the Army and was under the jurisdiction of the Coast Guard for the purpose of guarding it "particularly for fire and possibly sabotage, because we were in a very vulnerable position, being right across from the Oregon shipyards."

Yeoman testified that it was their duty to "* * * patrol the docks, there, and see that there wasn't anybody there that shouldn't be there, and look out for fires and any sabotage." On cross-examination, he was asked if he did not have instructions not to leave the West Oregon Lumber Company property and "go to some other place." In response to this question, he answered: "We were supposed to find out anything happening like that, report it to the base, and we just figured that something like that should be reported, and we should investigate it."

"Q. You mean that anything that happens around Linnton or Portland that you hear about, you are supposed to investigate?
"A. Anything on the front.
* * *
"Q. No matter how far away it is?
"A. Well, I wouldn't go down there a couple of miles, no."

Boynton testified that it was his duty to guard and patrol the waterfront docks, and that he had instructions from his commanding officer that he "* * * could go any place on the waterfront." The court in its opinion says that these Coast Guardsmen had only the authority to report such matters to the base. How could they make an intelligent report, if they had no authority to make an investigation?

The court speaks of the alleged trespass of plaintiff and the Coast Guardsmen as a matter of "agression". What does the record disclose? There is evidence showing that seamen often took the short-cut route to their boats. Yeoman testified:

"Q. Well, I see. Well, what did the Burns guardsmen do at the gate?

"A. Well, they stopped everybody, and if they had any business there they would leave them in.

\* \* \*

"Q. And they have a little office there, or guardhouse?

"A. Yes.

"Q. And when you would go in there would they stop you?

"A. No.

"Q. That is, if you had a uniform on?

"A. That is right.

"Q. But what about the merchant seamen?

"A. I never seen any of them come in through there. I was never at the gate when they came in.

\* \* \*

"Q. And what would they say when they stopped them?

"A. Well, they would ask them for their identification, where they was going, and what boat they were on.

"Q. And so the first thing they would do was ask for their identification, and would they require them to show it?

"A. The building is well lit up, too, with lights in it and out in front.

"Q. Then they would ask them where they were going?

"A. Yes.

"Q. And what boat they were on?

"A. Yes.

\* \* \*

"Q. And then if they answered they were on the boat down here, I suppose they would let them go by if they had the proper identification?

"A. That is right.

"Q. And that was the Burns guards?

"A. Yes."

The evidence is uncontradicted that plaintiff and his companions exhibited their identification cards and

"Ship's Passes" at the gate when challenged by the guards, yet it is argued in effect that Blackwolf did not know who these seamen were when they came back to investigate the shooting. Under this state of the record, what difference did it make to Blackwolf concerning the legal status of the plaintiff?

It is stated in the opinion of the court that Yeoman stated positively that the Coast Guardsmen had no authority to make an arrest. Yeoman was asked: "Were your duties to arrest anybody that had a fight?" He answered: "We could hold them." If he had the right to take such persons into custody, he had the right to arrest them, notwithstanding Yeoman's legal deductions to the contrary. I agree, however, that the Coast Guardsmen and plaintiff went on the premises to investigate and not necessarily to make an arrest.

Error is assigned on the admission in evidence of a United States Coast Guard identification card and a "Ship's Pass" which were in the possession of the plaintiff and his companion at the time in question. I think the jury was entitled to be advised as to the identity of the plaintiff and his companions and the reason for their being on the premises while en route to their ship. In my opinion, no error was committed in the reception of such evidence.

In my opinion, no error was committed in rejecting the following Offer of Proof by witness Harleigh Glass, an employee of the Burns Detective Agency, who worked as a watchman at the Tidewater Oil Company office:

"* * that (Glass) left there about 11:30 P. M., when three young men, whom he would describe sufficiently for identification, to identify them as the plaintiff Eldred and his two companions, went to the Tidewater office, and a few minutes later

they came out, and when they reached the road junction with the Kingsley road, 'they all three stopped and hollered and kept hollering all the time I was there, "Come up, you dirty son of a bitch, and bring your gun with you. Come up and fight like a man. Bring your gun and we will break it off in you," and other remarks of a similar nature. They were still yelling when my bus came along and picked me up. I was about 35 or 40 feet from them. I did not know they were yelling at our guard at Kingsley, but believe they were within hearing distance from the Kingsley office if anyone had been outside the office. I knew nothing of any trouble having taken place at Kingsley's, but thought they were scrapping with some of their own men who were out of my sight.' "

Appellants did not call the witness, Glass, and therefore there was no opportunity for plaintiff to cross-examine him, but the failure to produce the witness was waived by counsel for the plaintiff. *Columbia R. I. Co. v. Alameda L. Co.*, 87 Or. 277, 168 P. 64, 440. Plaintiff objected to the Offer of Proof on the ground that the threats and vile language therein referred to were not heard by Blackwolf and that there was no identification of the plaintiff as the person who made such threats or used the vile language. In reference to this objection, counsel for appellants stated: "I would say that I am not certain that all three of them did the yelling, but they were all together and were all doing some yelling." It was not contended that Blackwolf heard the threats or the profanity. Counsel for appellants stated that the Offer of Proof was made "to show the attitude of these three boys, and particularly the attitude of plaintiff."

It is not charged nor is there any evidence tending to show that plaintiff and his two companions were

conspiring or acting together for the purpose of injuring the defendant Blackwolf. Therefore, any declaration of Piel would not be admissible against the plaintiff, unless the declaration made in the presence of the plaintiff was of such nature as to call for a reply from him. *State v. Quen,* supra; *State v. Weaver,* 165 Mo. 1, 65 S. W. 308. In the absence of conspiracy, whatever Piel said, if anything, about going home and getting a gun would not tend to show that plaintiff had a hostile state of mind. However, if plaintiff urged Piel to go home and get his gun and to come back and "shoot it out", that evidence would clearly be admissible where self-defense is involved, as it would be relevant to the question as to who was the aggressor. Furthermore, if plaintiff made threats against Blackwolf, even though uncommunicated to the latter, evidence of such threats would be admissible to show a hostile state of mind. *State v. Rader,* 94 Or. 432, 186 P. 79; *State v. Doris,* 51 Or. 136, 94 P. 44, 16 L. R. A. (N. S.) 66; *State v. Thompson,* 49 Or. 46, 88 P. 583; *State v. Tarter,* 26 Or. 38, 37 P. 53.

Eliminating the second Offer of Proof, there is no evidence that the plaintiff ever made any threats against Blackwolf or indulged in any profanity on the occasion of the altercation between Blackwolf and Piel. There is no identification of the plaintiff in the Offer made by counsel for appellants. The general statement that the witness would "describe sufficiently for identification" is a mere conclusion and will not suffice. *Prestbye v. Kliphardt,* 113 Or. 59, 231 P. 187. The Offer should contain the specific evidence upon which the claim of identification is based. How was the plaintiff dressed? How did the witness distinguish the plaintiff from his two companions? Did the wit-

ness hear the plaintiff make the threats or use profane language? These are questions not covered in the Offer, and we think the court did not err in rejecting it. I apprehend that counsel for appellants in making the Offer of Proof made it as specific as the evidence justified.

As said in *Columbia R. I. Co. v. Alameda L. Co.,* supra:

"An offer of proof should state facts rather than conclusions. Its language should be not vague, but distinct; not general, but specific. It is not sufficient that it state the ultimate facts in language appropriate to a pleading; the evidentiary facts must be set out."—citing numerous authorities in support thereof.

In 53 Am. Jur., Trial, § 102, the rule is thus stated:

"Evidence must be proffered in correct form. The party making the offer must state clearly what he intends to prove. Offers of proof must be offers of relevant proof, specific, not so broad as to embrace irrelevant and immaterial matter, and must be made in good faith. An offer of evidence tending to defeat recovery should be of facts clear and distinct in their character, and not of doubtful or uncertain import."

This case demonstrates it is dangerous to vest some persons with authority, because they seem ever anxious to exercise it. Blackwolf, "dressed in a little brief authority", apparently thought he had the right to shoot the plaintiff for the purpose of ejecting him from the premises. When the large shiny badge of "William J. Burns, Detective Agency" was pinned on the breast of Blackwolf, it seems to have affected his head.

What is the result? An able-bodied seaman, and a

member of the United States Merchant Marine, earning between $450 and $500 per month, has been permanently injured and incapacitated. The amount of the verdict is not challenged. It is a just verdict and ought to be sustained.

---

### PETITION FOR REHEARING

*Herbert A. Bergson,* Acting Assistant Attorney General; Henry L. Hess, United States Attorney; Leavenworth Colby, Attorney, Department of Justice; and John I. Sullivan, Acting Chief Counsel, United States Coast Guard; on brief for the United States as Amicus Curiae.

WINSLOW, J., (Pro Tempore.)

We have for consideration a petition for rehearing filed by respondent, supported by an able brief. In addition thereto, the United States has filed a brief as amicus curiae. In these briefs our attention is called to some Coast Guard regulations not referred to in respondent's original brief. These additional regulations, however, were thoroughly considered by the court at the time of our decision of this case. The statement in the opinion, that "under certain circumstances, the Captain of the Port could and did send Coast Guardsmen onto the Kingsley property, in the day time, for the purpose of investigating fire conditions," was not intended as a limitation on the authority of the Captain of the Port, but only as a statement of the manner in which he had theretofore exercised that authority, as shown by the record in this case.

Section 7.5 of these regulations (Part 7, Chapter I,

Title 33, Code of Federal Regulations) provides, among other things, as follows:

"Powers of the Captain of the Port. The Captain of the Port and his duly authorized representatives shall have the right of entry to waterfront facilities at all times."

■ True, under this regulation the Captain of the Port had authority to go onto the Kingsley property at all reasonable times, but we are not dealing with that situation here. He didn't go. True, the Captain of the Port could have sent Yeoman and Boynton to the Kingsley property at any reasonable time, but he didn't do it. He sent them to the West Oregon property. Here we are not dealing with theoretical possibilities but with actualities. We are dealing with this record as made. The reference in this regulation to the Captain of the Port does not include his subordinates unless they are authorized by him. 1 U. S. C. A. 1; *Morgan v. United States,* 298 U. S. 468, 478-9, 80 L. Ed. 1288, 1294, 56 S. Ct. 906; *Payton v. McQuown,* 97 Ky. 757, 31 S. W. 874, 877, 31 L. R. A. 33; *City of Muscatine v. Sterneman,* 30 Iowa 526.

■ It is argued that Yeoman and Boynton were the "duly authorized representatives" of the Captain of the Port within the meaning of this regulation. Duly authorized representatives for what? The answer to that question is clear: To carry out their assignment patrolling the West Oregon property. Certainly it could not be contended that they were the duly authorized representatives for all purposes. The responsibility for the success of this vast scheme of guarding and patrolling these waterfront facilities rested upon the shoulders of the Captain of the Port. It will be presumed that he was a man of sound judgment and broad experience, that he knew when and

where to send his subordinates, and that he had a purpose in sending Yeoman and Boynton to the West Oregon property. A gigantic organization of this kind can function efficiently when, and only when, every man in that organization adheres strictly to his assignment.

It is contended that the position taken by the United States constitutes an administrative construction of these regulations. In the first place, the regulations are clear and need no construction. Again, there is no showing in this record that the Captain of the Port so construed them. Certainly the position of the United States attorney does not constitute an administrative construction.

▇ The Government calls our attention to article 202 of the Regulations for the United States Coast Guard, 1940, Chapter II, which reads as follows:

"The Coast Guard is charged with the prevention, detection, suppression of violations of laws of the United States on the high seas, in Harbors, bays, sounds, roadsteads, and like bodies of water along the coasts of the United States, its territories and possessions, and shores of the Great Lakes, and on the Great Lakes and the connecting waters thereof."

This article clearly has no application to the situation with which we are here dealing. This was on land; a waterfront facility.

Again, our attention is called to article 1901 of the Coast Guard Regulations, supra, Chapter XIX, which is as follows:

"All persons of the Coast Guard shall make themselves familiar with, observe, obey, and, so far as lies in their power or in their sphere of action, enforce the law relating to the Coast Guard, these

regulations, and such orders, circulars, and instructions as may be issued by superior authority. In the absence of specific instructions they shall conform to the customs and usages of the Service. They shall be vigilant in observing defects in aids to navigation and shall promptly report or correct such defects so far as is within their power. They shall obey readily and execute with promptitude and zeal the lawful orders of their superiors. They shall show to their superiors all proper deference and respect.''

■ The laws which Coast Guardsmen are thus enjoined to enforce ''in their sphere of action'' are the laws relating to the Coast Guard, not the laws of the State of Oregon.

Many hypothetical emergencies are created in the briefs, and, based thereon, certain arguments are made and conclusions drawn. It is neither necessary nor proper for this court to decide cases not before it. ''Sufficient unto the day is the evil thereof.''

The suggestion is several times repeated in the brief of the Government that the opinion in this case holds that the Burns detective guards were an ''agency of the United States Government.'' The opinion intends no such suggestion. However, the Burns guards constituted one of the agencies assisting in guarding these war industries. We indicated no superiority between Blackwolf, Yeoman and Boynton. They each had a duty assigned to them. Blackwolf was to guard the Kingsley property; Yeoman and Boynton, the West Oregon property. Neither had a right to interfere with the other.

It is contended that regulation 7.16, Part 7, Chapter I, Title 33, Code of Federal Regulations, gave Yeoman and Boynton authority to go to the Kingsley

property for the purpose of reporting suspicion of sabotage to the Captain of the Port. The regulation reads:

> "7.16. Reporting of Sabotage. The evidence of or suspicion of sabotage or of any other subversive activity involving a waterfront facility or personnel employed thereon, shall be reported immediately to the Captain of the Port * * *."

■ There was nothing in the statements of respondent, Piel and Gill to Yeoman and Boynton even tending to indicate suspicion of sabotage. Again, the record is clear that they did not go there for that purpose.

The Government says:

> "It is also apparent from Sections 7.1, 7.5, 7.16 and 7.22 that the responsibility and jurisdiction of the Coast Guard in the administration of port security regulations is equally broad and extends to the control of private guards in all their activities."

It is true that these regulations required the Kingsley guards to be citizens of the United States, of good moral character, in satisfactory physical condition and acceptable to the Captain of the Port. It is to be presumed that Anderberg and Blackwolf met those requirements. There isn't a suggestion in these regulations that these guards should be acceptable to all members of the temporary Auxiliary Coast Guard, or that they were subject to the order or direction of anyone except the owner of the facility.

■ It is strenuously contended by respondent that Blackwolf could have had no reasonable basis for belief that respondent, Piel, Yeoman and Boynton were trespassers. As the opinion points out, the evidence regarding the manner of approach of respondent and

others to Blackwolf is very much in conflict. This was clearly a question of fact for the jury.

On page 36 of respondent's brief, it is said:

"We must confess our utter amazement that the majority of this Court should decide the question presented by the offer of proof by Harleigh Glass on the apparent assumption that it involved threats made by respondent * * *."

The court entertained no such assumption, nor did we decide the question presented by this testimony, other than to say that the trial court was in error as to his reason for rejecting the same. To this we added that "the witness was not present at the time the showing was made, and it is not at all clear that the same question will present itself in the same form upon a retrial."

Respondent again earnestly urges that even if it be conceded that he was a trespasser at the time of the shooting, and even if it be conceded that it was error to instruct the jury that he was not such trespasser, nevertheless the error was harmless for the reason that "the entire question of trespass is wholly foreign to a case in which self-defense is the sole and only issue."

We have again given consideration to this question and to the argument and authorities submitted by respondent in support thereof, as well as to the argument and authorities submitted by appellant, contra. A fair summary of the cases submitted by respondent may be made as follows: That one may not shoot a trespasser or inflict upon him great bodily harm just because he is a trespasser. That is in exact accord with the rule we enunciated in our original opinion. This is not the equivalent of holding that the issue

of trespass is foreign to a case in which self-defense is the sole issue. For the reasons pointed out, the question of trespass was material to the issue involved herein. *People v. Reese,* 65 Cal. App. (2d) 329, 150 P. (2d) 571; *Stacey v. Commonwealth,* 189 Ky. 402, 225 S. W. 37, 25 A. L. R. 490; *People v. Dann,* 53 Mich. 490 N. W. 159; *Boykin v. States,* 86 Miss. 481, 38 So. 725; Restatment of the Law of Torts § 79.

Upon a re-examination of the record, we find one statement in the opinion which we desire to correct. We there said:

"At the time involved, there was maintained at this passageway, both on the Kingsley property and on the West Oregon property, signs reading: 'Warning. Do not trespass. Enter these premises at main gate only. Order of U. S. Coast Guard.'"

The fact is that there was but one such sign and that was on the West Oregon Company property. Due to confusion in directions, we had construed exhibits 8 and 9 as showing different signs, facing one another. A study of the detail disclosed in these exhibits demonstrates that they both portray the same sign.

The petition for rehearing is denied.

BELT, J., dissenting.

In my opinion the court has unduly stressed the issue as to whether the plaintiff was a trespasser. After all, the sole question is whether Blackwolf shot the plaintiff in self-defense. Assuming that plaintiff was a trespasser, Blackwolf would not by reason thereof be justified in shooting him. Notwithstanding all that has been said about the legal niceties of trespass, it is doubtful whether Blackwolf, at the time of the shooting, ever paused to consider the legal status of

the plaintiff. He was intent on ousting him from the premises.

With all deference to my brothers, I respectfully suggest that a rehearing be granted and that the court confine itself to the real issue in the case.

---

Costs RETAXED.

WINSLOW, J., (Pro Tempore.)

█ Objections have been filed to appellants' cost bill. The first three objections refer to printing. The last and fourth objection refers to the premium on appellant's bond.

Rule 19 of the Rules of the Supreme Court was amended on September 10, 1946, and section 2 thereof now reads as follows:

"Section 2. The party awarded costs is entitled to recover the actual cost of printing his abstract and briefs (not exceeding 40 copies of each), in the sum of not more than $1.25 a page, including cover, in appeals perfected and original proceedings instituted prior to October 1, 1946, and not more than $1.50 a page, including cover, in appeals perfected and original proceedings instituted thereafter, unless for special reasons apparent on the record it shall be otherwise ordered."

This appeal, however, was perfected prior to this amendment, and it is therefore governed by the $1.25 rate. Appellants' abstract of record, including cover and index, consists of 20 pages, and at $1.25 a page should be $25.00. Appellants' first brief, including cover and index, is 130 pages, and there should be allowed for printing thereof $162.50. Appellants' reply brief, including cover and index, consists of 88 pages,

and there should be allowed for printing the same $110.00.

The fourth objection refers to an item for $800.00 for the premium upon the appeal bond. The item in the cost bill shows that this charge is for two years which would be at the rate of $400.00 a year. The appeal was perfected on February 25, 1946, and allowance should be made for 22 months, or a total of $733.33.

The costs will be retaxed as herein set forth.